UNITED STATES, Appellee,

v.

Private First Class Wyatt L. MATTHEWS, SSN 175–46–5017, United States Army, Appellant.

CM 439064.

U. S. Army Court of Military Review.

17 March 1982.

504

Anthony F. List, Esquire, and Captain Joseph A. Russelburg, JAGC, argued the cause for the appellant. With them on the brief were Colonel Edward S. Adamkewicz, Jr., JAGC, Lieutenant Colonel John F. Lymburner, JAGC, Major Lawrence D. Galehouse, JAGC, Captain Allan T. Downen, JAGC, and Vincent G. Iannello, Esquire.

Captain Michael E. Pfau, JAGC, and Captain Eugene R. Milhizer, JAGC, argued the cause for the appellee. With them on the brief were Major Ted B. Borek, JAGC, Major Paul G. Thomson, JAGC, Captain Michael C. Chapman, JAGC, and Captain Paul K. Cascio, JAGC.

Before the court en banc.

## OPINION OF THE COURT

FOREMAN, Judge:

The appellant was charged with premeditated murder and rape, in violation of Articles 118 and 120, Uniform Code of Military

Justice, 10 U.S.C. §§ 918 and 920 (1976), respectively. The case was referred to a general court-martial as a capital case. The appellant tendered pleas of guilty to both charges and specifications, but his pleas were rejected by the military judge, because a plea of guilty may not be received to a capital offense. Article 45(b), Uniform Code of Military Justice (hereafter cited as "UCMJ"), 10 U.S.C. § 845(b) (1976); paragraph 70a, Manual for Courts-Martial, United States, 1969 (Revised edition) (hereafter cited as "MCM"). The appellant then pleaded not guilty to premeditated murder, but guilty to the lesser included offense of unpremeditated murder, and not guilty to rape. He was convicted of premeditated murder and rape, and on 3 July 1979 he was sentenced to be put to death, to be dishonorably discharged, to forfeit all pay and allowances, and to be reduced to Private E-1. The convening authority approved the sentence. The case is before this Court for mandatory review pursuant to Article 66, UCMJ, 10 U.S.C. § 866 (1976).

The appellant has challenged the *in personam* jurisdiction of the court-martial, the adequacy of the record of the pretrial investigation, the qualifications of the court members and the military judge, the refusal of the military judge to accept the appellant's guilty pleas, the propriety of the trial counsel's opening statement, the failure of the prosecution to give proper notice of grants of immunity, the legality of admitting certain photographs of the victim, the sufficiency of the evidence, the propriety of his own counsel's opening statement and closing argument before the court members, the constitutionality of the death penalty, and the appropriateness of the sentence.

## I. FACTS OF THE CASE

The victim, Phyllis Jean Villanueva, worked as a librarian at the Camp Algiers library, located at Grafenwoehr, Federal Republic of Germany. The appellant was assigned to Battery B, 1st Battalion, 14th Field Artillery, which had arrived at Grafenwoehr during late January 1979.

At about 1500 hours on the afternoon of 27 February 1979, Private First Class Brian K. Taub and Private First Class Silvester A. Flores observed the appellant in the vicinity of the library, following Mrs. Villanueva and apparently attempting to engage her in conversation.

Specialist Four Larry B. Lawson was in the library at about 1700 hours. He, the appellant and Mrs. Villanueva were the only persons in the library. Lawson observed the appellant talking to Mrs. Villanueva and leaning over her desk, at which she was seated. The appellant asked Mrs. Villanueva for a date, but she replied that she was a happily married woman. The appellant then asked Mrs. Villanueva for some "sexy books" but she told him to obtain them from the post exchange book store across the street. When Specialist Lawson departed the library about 1720, the appellant was wandering around and appeared to be merely passing time.

At about 1845 hours, Sergeant Mario Ledezma saw the appellant at the laundromat adjacent to the library, but he noticed nothing unusual. A short time later, Sergeant Ledezma tried to enter the library but found the entrance locked, which was unusual because the "closed" sign was not posted and the library was usually open until 2000 hours.

During the early evening the appellant was observed by several soldiers as he entered his barracks wearing a white T-shirt, khaki pants over green sweat pants and white tennis shoes. He had blood on his shirt, pants, hands and arms. Specialist Four Mark A. LaRue saw the appellant enter and asked him if he had been in a fight, but the appellant did not respond. A few minutes later, the appellant asked LaRue if he (the appellant) had blood on his face and LaRue answered in the negative. The appellant returned to his own area of the barracks where a group of soldiers gathered around, including Private Darrell D. Hughley. The appellant removed the bloody T-shirt and khaki pants and left them on the floor. Hughley picked up the T-shirt but the appellant snatched it away.

Hughley asked the appellant what had happened and the appellant replied that he had been in a fight off-post. Hughley, noticing the absence of any marks on appellant's face, told the appellant that he did not believe him. The appellant then said, "I done killed this bitch."

Specialist Four Jerome Turner, one of the soldiers gathered around the appellant, joined the conversation and the appellant told Turner that he "just went berserk." The appellant told Turner, "I was stabbing her, I was f___ing her, I was stabbing her, I was f___ing her, I was stabbing her."

Hughley and others told the appellant to take a shower, and appellant complied. He returned to his area wearing an Army-issue blue physical training uniform and combat boots. He was then observed trying to burn blood spots off the green sweat pants.

During the conversations among the appellant and his fellow soldiers, the appellant asked Specialist LaRue to keep a blood-stained sweater for him, but LaRue ignored him. The appellant gave a watch, later identified as Mrs. Villanueva's, to Specialist Turner and asked him to hold it.

Later in the evening, Specialist Four James R. Bagwell approached the appellant, unaware of the earlier events, intending to borrow money from him. The appellant and Bagwell were from the same home town and were friends. The appellant was sitting on his foot locker and crying, saying his mother was sick. Bagwell asked to borrow some money and the appellant responded that he had none. At Bagwell's invitation they started walking toward the beer hall. As they were walking, the appellant told Bagwell, "Home boy, I think I f___ed up again . . . I think I killed the woman . . . I stabbed her." Bagwell said he didn't want to hear about it. After they each drank a beer, the appellant said, "I got to go back. I forgot something. I left a six-pack of beer." As they were walking back to the barracks from the beer hall, Bagwell asked the appellant to tell him what had happened. The appellant told Bagwell that he waited in the library until everyone had left and then began a conver-

sation with Mrs. Villanueva. The appellant told Bagwell that Mrs. Villanueva had implied that she was interested in having sexual intercourse with him. The appellant said that he asked Mrs. Villanueva to obtain a book for him, and while she was obtaining it he locked the door and followed her to the back of the library. The appellant told Bagwell that he repeatedly poked Mrs. Villanueva in the ribs with a pair of scissors because "she wouldn't move right." Then the appellant said, "she made me mad, and I just starts stabbing her all over, in her eyebrows . . . I just stabbed her all over."

The appellant, followed by Bagwell, returned to the library and retrieved his six-pack of beer and some scissors. On the way back to the barracks, the appellant told Bagwell, "I think she's dead, she didn't move." The appellant told Bagwell that he wore gloves while he was in the library earlier, but that the beer had his fingerprints on it. The appellant also remarked that his victim was a warrant officer's wife.

Back at the barracks the appellant put the scissors in a pair of socks. He took a pair of woman's panties from a brown paper bag, smelled them and offered to let Bagwell smell them. Bagwell noticed a pair of woman's shoes in the bag. There were no blood stains on either the panties or the shoes. The appellant also showed Bagwell his own underwear shorts, pointing out what the appellant said were semen stains. The appellant gave Bagwell a set of keys, later identified as Mrs. Villanueva's, a pair of scissors, and the bag containing the woman's shoes. The appellant placed the panties in his pocket. At the appellant's request, Bagwell threw away the keys and scissors and burned the shoes.

At about 2100 hours Chief Warrant Officer Candelario P. Villanueva, the victim's husband, became concerned because his wife was late returning home. He obtained a ride to the library from Staff Sergeant Larry Ealy, a neighbor. Mr. Villanueva found the library dark but the door unlocked. He entered, turned on the lights, and found his wife lying in a pool of blood, barefoot and naked below the waist. Mr.

Villanueva covered his wife's pubic area with a towel and asked Sergeant Ealy to summon an ambulance and the military police.

As agents of the Grafenwoehr CID office entered the library, they noticed feces near the front entrance, near the librarian's desk, and against Mrs. Villanueva's right thigh, indicating that she had defecated while moving between the front entrance and the rear work area where the body was found. No blood stains were found beyond the rear work area.

Specialist Four Robert S. Forry, returning from off-post late on the night of 27 February 1979, saw smoke and the remains of a smoldering fire next to the barracks. The next morning he found shoe soles, underwear, socks, and some plaid material, all partially burned.

On the morning of 28 February 1979, the appellant showed Private Hughley some Army gloves and told Hughley he was going to dip them in diesel fuel to get the blood off. The appellant asked Hughley to write a letter for him in order to obtain leave to visit his sick mother, and Hughley agreed. The appellant said he was too nervous to write the letter.

The keys and scissors thrown away by Bagwell were later recovered by the CID with Bagwell's assistance. The scissors were found to contain blood and hair fragments consistent with the blood type and pubic hair of Mrs. Villanueva.

The appellant's green sweat pants were seized from his wall locker, and his tennis shoes were found on the roofs of two separate buildings. The sweat pants and tennis shoes were found to contain blood stains of the same type as Mrs. Villanueva's but unlike the appellant's. Several bloody foot prints at the library were found to have been made with the appellant's tennis shoes.

An autopsy was conducted on Mrs. Villanueva on 1 March 1979, which revealed 53 stab wounds, of which 6 were potentially fatal. There were a total of seven stab wounds in her left temple area. On her face were 13 stab wounds and a blunt force injury around her left eye. Based upon the amount of bleeding, the pathologist concluded that the wounds to the face probably were inflicted first. There were multiple neck wounds, including one fatal wound which pierced her jugular vein. There were six chest wounds, including two fatal wounds to her lungs and three fatal wounds to her heart. There were multiple non-fatal wounds in the abdomen, one in her pubic area, and several in her left back. Several "defensive" wounds, of the type usually inflicted when a victim attempts to defend, were found on Mrs. Villanueva's hands. There were numerous superficial scratches on her face, pubic area and back. In addition, there was a large laceration of the vaginal wall, probably inflicted by a sharp instrument after her death.

The pathologist found sperm in Mrs. Villanueva's vagina, which he estimated to be three or four days old as of 1 March 1979, the date of his examination. The pathologist testified that sperm would be detectable for up to a week after intercourse, but usually was detectable only for a shorter period. Mr. Villanueva testified that he and his wife last had sexual intercourse on the Thursday before her death, which occurred on the following Tuesday.

The appellant was evaluated by Major Larry D. Reed, a psychiatrist. Major Reed found that the appellant was free from substantial mental disease or defects and did not lack substantial capacity to appreciate the criminality of his conduct or the ability to control his conduct to the requirements of the law. However, Major Reed also found that the appellant has an IQ of 64,[1] making him "mildly retarded," and has an "explosive personality disorder." Although not schizophrenic, the appellant has opposing feelings of good and evil within himself. When he drinks, the evil side

---

1. The appellant's military records (Prosecution Exhibit 64) reflect a General Technical (GT) score of 72.

manifests itself. Because of his low intelligence, the appellant tends to think in concrete instead of abstract concepts. Consequently, he tends to react to perceived injustice by angry and violent behavior. The appellant told Major Reed that he drinks heavily and sometimes provokes fights with the intention of being killed. On cross-examination, Major Reed conceded that the appellant may have a "death wish" to be executed for his crimes.

## II. JURISDICTION

The appellant contends that the court-martial had no *in personam* jurisdiction over him because his enlistment was void *ab initio*, due to the misconduct of an Army recruiter. He contends that the recruiter, Sergeant Daryle Roberts, actively participated in obtaining his release from probation in violation of Army regulations; that Sergeant Roberts advised him to conceal a non-waivable disqualification for enlistment, *i.e.*, his past history of alcoholism; and that Sergeant Roberts obtained a waiver of his moral disqualification (*i.e.*, criminal record) for enlistment based upon incomplete documentation. *See generally United States v. Russo*, 1 M.J. 134 (C.M.A.1975).

Prior to his enlistment into the Army the appellant, then 19 years old, was arrested on 10 March 1976 for "unlawful taking, receiving stolen goods, burglary, conspiracy, and resisting arrest." On 29 September 1976, at his request, the appellant was placed in the Accelerated Rehabilitative Disposition (ARD) Program of the Court of Common Pleas of Delaware County, Pennsylvania, and was placed on probation for two years.

On 5 January 1977, the appellant was interviewed by Miss Susan A. Pringle, a probation officer, who entered in her notes that the appellant was "definitely a problem drinker—probably alcoholic." On 10 January 1977, the appellant voluntarily entered the Crozer-Chester Medical Center in Chester, Pennsylvania for in-patient treatment of his drinking problem.

In May 1977, the appellant contacted Sergeant Roberts, an Army recruiter in Chester, Pennsylvania, and expressed interest in enlisting. At that time Sergeant Roberts informed the appellant that he could not enlist without a "moral waiver" because of his civilian arrest and conviction record, and that he could not enlist while on probation.

At the trial, Sergeant Roberts testified that he contacted Miss Pringle, with whom he was acquainted from prior official contacts, told her that the appellant desired to enlist, informed her that he was prohibited from approaching anyone in an effort to terminate the appellant's probation, and advised her that he had directed the appellant to her so that the appellant could initiate action to terminate his probation. Sergeant Roberts testified that Miss Pringle advised him of her intention to ask the court to terminate the appellant's probation.

On 9 June 1977, the probation office requested the court to dismiss the charges against the appellant, which had been held in abeyance as part of the ARD Program. They also requested early termination of the two-year probation.

The request recited that the appellant's first day of military service would be 17 June 1977, a fictitious tentative date provided by Sergeant Roberts. Miss Pringle testified that she and Sergeant Roberts had worked out a system of using "tentative enlistment" dates to solve a "Catch-22" problem created by the fact that the court would not terminate probation until the appellant enlisted, yet the appellant could not be enlisted until the court terminated the probation.

In accordance with Miss Pringle's request, the charges against the appellant were dismissed and his probation was terminated on 7 July 1977. The appellant enlisted in the U. S. Army Reserve on 15 July 1977 under a "delayed entry" program. He then enlisted in the Regular Army and entered active service on 2 August 1977.

The appellant testified that he told Sergeant Roberts that he was an alcoholic, and that Sergeant Roberts advised him to conceal his alcoholism. The appellant also testified that he listed his treatment for

alcoholism on the initial medical history form which he completed in connection with his enlistment physical examination, but that the form must have been lost. The appellant testified that on two subsequent medical history forms he concealed his history of alcoholism because Sergeant Roberts had advised him to do so.

Miss Pringle testified that when Sergeant Roberts provided her with an Army form to be completed as part of the request for a moral waiver for the appellant, Sergeant Roberts told her not to "go into any of the problems," but simply to indicate that the charges had been dismissed. Although Miss Pringle at first testified that she had told Sergeant Roberts that the appellant was an alcoholic, when questioned by the military judge she stated that she merely "assumed" that she had advised Sergeant Roberts that the appellant had been treated for alcoholism, but that she had no specific recollection of having done so. Her testimony further reflects her belief that appellant's treatment had been successful.

Sergeant Roberts testified that he was totally unaware of the appellant's alcoholism, that he would not have enlisted the appellant if he had known about it, that neither the appellant nor Miss Pringle mentioned it, and that he at no time advised the appellant to conceal treatment for alcoholism.

At the conclusion of the hearing on the jurisdictional issue, the military judge made detailed findings of fact. First, he found that at the time of his enlistment the appellant met the minimum age and mental qualifications for enlistment. Next, he found that the moral waiver packet prepared as a result of the appellant's disclosure of prior criminal conduct was sufficient to support a valid waiver of the civilian arrest record even though Sergeant Roberts neglected to include a copy of the appellant's high school diploma among the supporting documents. He found that the only evidence that Sergeant Roberts knew about the appellant's alcoholism was the appellant's testimony which was counter-balanced by Sergeant Roberts' own testimony

that he did not know about it. The military judge believed that, although it was doubtful that the appellant was an alcoholic as a matter of medical diagnosis, his conduct had led knowledgeable persons to conclude prior to his enlistment that he was an alcoholic.

The military judge found that the appellant was and is manipulative, deceptive and has a unique ability to enlist the aid and assistance of others to obtain his objectives. The judge noted that the appellant admitted in his own testimony that he had lied to every Army representative except Sergeant Roberts, obtained false character affidavits, persuaded his probation officer that he was rehabilitated and that enlistment was in his best interests, persuaded his probation officer to sign a less than truthful record, falsified each entry pertaining to alcoholism on all enlistment forms, and successfully withstood all attempts at all levels to determine whether any such disqualification existed. The judge concluded that the appellant would have been unlikely to disclose his alcoholism if he knew it would bar him from enlisting, unless he was certain that the person to whom he made the disclosure would be willing to violate the law to assist him.

The judge further found that, although Sergeant Roberts was willing to bend the rules by providing a fictitious date of prospective enlistment to permit a potential recruit to seek termination of probation, and although he may have told the appellant that an affirmative response to certain questions would either require a waiver or constitute a bar to enlistment, he did not assist the appellant in falsifying any enlistment forms, nor did he give the appellant any reason to believe that he would be willing to do so, and that the testimony of Sergeant Roberts was more credible than that of the appellant, although neither standing alone was totally persuasive. The judge believed that Sergeant Roberts' truthfulness was bolstered by the fact that he had prepared a "moral waiver" packet in the appellant's case.

Lastly, the judge found that the initiative to enlist was that of the appellant and not that of Sergeant Roberts, the Pennsylvania courts, the probation officer, or any other official, and that the appellant desired to be a soldier, accepted the benefits of military service, and never made any meaningful effort to be released.

Based on his findings of fact, the military judge concluded that at all times during the enlistment process the appellant possessed the capacity to enter a contract and assume military status; that the technical defects in the moral waiver packet were, at most, latent defects making the enlistment voidable rather than void; that Sergeant Roberts was guilty of no recruiter misconduct, although he may have been negligent; and that the appellant's false and fraudulent representations, not Sergeant Roberts' negligence, were the proximate cause of the appellant's enlistment. He further concluded that, notwithstanding the fabricated prospective enlistment date, there was no fraud perpetrated on the Pennsylvania courts, and that the appellant's probation was validly terminated prior to his enlistment. Lastly, he concluded that the appellant's enlistment was "voluntary" in every sense; and that the enlistment was merely voidable rather than void.

We hold that the military judge correctly found that the appellant was subject to the jurisdiction of the court-martial. Two of appellant's arguments can be disposed of without lengthy discussion.

■ With respect to the alleged violation by Sergeant Roberts of the prohibition against actively participating in the termination of probation, we find that Sergeant Roberts' conduct was within the apparent limits of the regulation. However, even assuming *arguendo* that his contact with Miss Pringle violated Army regulations,[2] the cited paragraph does not establish a regulatory bar to enlistment of an individual, but merely establishes a rule of conduct for recruiters to avoid their being placed in a compromising or embarrassing situation. The qualifications and disqualifications for enlistment are treated in detail elsewhere in the regulation.

■ Regarding the allegedly incomplete moral waiver packet, we do not believe that the negligent omission of the high school diploma defeats jurisdiction. At most, it amounts to an administrative irregularity which does not nullify the waiver granted by the reviewing officer.

■ Under the controlling case law in effect prior to the effective date of the November 1979 amendments to Article 2, UCMJ,[3] recruiter misconduct designed to conceal a nonwaivable disqualification would defeat jurisdiction. *United States v. Russo*, 1 M.J. 134 (C.M.A.1975). However,

2. Army Regulation 601–210, Personnel Procurement, Regular Army Enlistment Program, 15 January 1975, paragraphs 3–13*d* and *e*, which was in effect at the time of appellant's enlistment, prohibited Army recruiting personnel from participating in obtaining the release of an individual from a pending criminal charge in order that he might enlist in the Army as an alternative to further prosecution, and from participating in securing the release of an individual from civil restraint (defined as including confinement, probation, parole and suspended sentences) in order that he might enlist. The current version of the regulation, dated 1 October 1980, contains the same prohibition.

3. Article 2, UCMJ, 10 U.S.C. § 802 (Supp. III, 1979), which became effective 9 November 1979, provides in pertinent part as follows:

(b) The voluntary enlistment of any person who has the capacity to understand the significance of enlisting in the armed forces shall be valid for purposes of jurisdiction under subsection (a) of this section and a change of status from civilian to member of the armed forces shall be effective upon the taking of the oath of enlistment.

(c) Notwithstanding any other provision of law, a person serving with an armed force who—

(1) submitted voluntarily to military authority;

(2) met the mental competency and minimum age qualifications of sections 504 and 505 of this title at the time of voluntary submission to military authority;

(3) received military pay or allowances; and

(4) performed military duties;

is subject to this chapter until such person's active service has been terminated in accordance with law or regulations promulgated by the Secretary concerned.

jurisdiction would be defeated only if Sergeant Roberts were aware of the appellant's alleged alcoholism prior to the enlistment and advised, counseled, or encouraged the appellant to conceal it. The trial judge was satisfied that Sergeant Roberts was unaware of the disqualification.

The trial judge rejected the appellant's testimony and believed Sergeant Roberts. He made no mention of Miss Pringle's testimony in his findings of fact, which we find understandable in view of the wavering and inconclusive nature of her testimony. Because of his superior opportunity to observe the demeanor of the witnesses and evaluate their credibility, the military judge's belief of Sergeant Roberts and rejection of the appellant's testimony on this issue should not be disregarded lightly. Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1976); *United States v. Frierson*, 20 U.S.C.M.A. 452, 454, 43 C.M.R. 292, 294 (1971); *United States v. Albright*, 9 U.S.C.M.A. 628, 631, 26 C.M.R. 408, 411 (1958); *United States v. Evans*, 6 M.J. 577, 579 (A.C.M.R.1978); *pet. denied*, 6 M.J. 239 (C.M.A.1979).

■ We have independently reviewed the evidence and are satisfied that Sergeant Roberts was unaware of the appellant's alleged alcoholism at the time of appellant's enlistment. Even if we assume, *arguendo*, that Sergeant Roberts was negligent in not discovering the appellant's possible disqualification, such negligence does not deprive the court-martial of jurisdiction. *United States v. Valadez*, 5 M.J. 470 (C.M.A.1978).

Since we are satisfied that Sergeant Roberts was not involved in any deliberate concealment of a non-waivable disqualification, we need not decide whether the November 1979 amendments to Article 2, UCMJ, may be applied retroactively to cases, such as this one, tried prior to the effective date of the amendment.

## III. FAILURE TO PROVIDE A VERBATIM TRANSCRIPT OF THE ARTICLE 32 INVESTIGATION.

The appellant contends that the refusal of the government to provide a verbatim transcript of the Article 32 hearing[4] deprived him of his Sixth Amendment right to effective representation by counsel. We find this contention to be without merit.

■ The appellant has cited no legal authority for requiring a verbatim transcript and we have found none. The law requires only that "a statement of the substance of the testimony taken on both sides" be prepared. Article 32(b), UCMJ, 10 U.S.C. § 832(b) (1976); paragraph 34e(2), MCM, 1969 (Rev.); *United States v. Allen*, 5 U.S. C.M.A. 626, 18 C.M.R. 250 (1955); *United States v. Frederick*, 7 M.J. 791, 796 (N.C.M. R.), *pet. denied*, 8 M.J. 42 (C.M.A.1979); *United States v. Combs*, 28 C.M.R. 866, 873 (A.F.B.R.1959). As the trial judge so aptly observed when the same issue was raised before him, "[T]he court is required to consider not perhaps what would have been best, but whether what was done met the requirements of law."

Furthermore, we find appellant's contention that the lack of a verbatim transcript deprived him of the effective assistance of counsel without factual basis. The appellant was ably and vigorously represented by detailed counsel at the hearing. The Investigating Officer's Report, Item 2g, and Appellate Exhibit 7, the investigating officer's handwritten notes, reflect that, although the individual civilian counsel had been retained, he elected not to attend the hearing. The investigating officer's report also reflects that the detailed defense counsel coordinated the defense strategy at the hearing with the individual counsel. For example, the detailed counsel, after consultation with individual counsel, withdrew a request for defense witnesses. There is no legal requirement to take extraordinary meas-

---

4. Article 32, Uniform Code of Military Justice, 10 U.S.C. § 832 (1976) requires that a thorough and impartial investigation be conducted prior to referring a case for trial by general court-martial. As part of this investigation, the ac- cused is entitled to be represented by counsel and to cross-examine witnesses against him as well as present matters in defense, extenuation, or mitigation.

ures to assist individual counsel in trial preparation when he voluntarily foregoes the discovery opportunity provided by the Article 32(b) investigation. Nevertheless, the record reflects that the investigating officer in this case went to extraordinary lengths to insure that the individual counsel would receive as complete and detailed a report as possible. We are satisfied that the Article 32(b) investigation was conducted in full compliance with the law and that the appellant was fully afforded his right to representation by counsel.

## IV. DISQUALIFICATION OF COURT MEMBERS.

The appellant contends that the court members in this case were "biased and prejudiced against the accused in that they possessed explicit prior knowledge of all pertinent events of this case from the moment of the crime up to and through investigation and the actual Court-Martial proceeding." This contention is without factual support in the record.

█ A searching voir dire by the military judge and counsel for both sides revealed that, of the ten court members detailed to hear the case, only two had any knowledge beyond vague recollection of news reports and casual conversations within the command indicating that a librarian at Camp Algiers had been raped and murdered, that someone had been charged, a trial had commenced, and a motion to dismiss for lack of speedy trial had been denied. All members clearly indicated their lack of predisposition or bias, as well as their willingness to withhold judgment until they had heard all the evidence and had been instructed on the law and to follow the military judge's instructions.

Two officers, Major Waits and Captain Everett, were challenged by the prosecution, but the challenges were opposed by appellant's counsel. Needless to say, we find it curious that the same counsel who opposed the challenges at the trial now predicates error on the failure of the mili-

tary judge to excuse these same two members.[5]

Major Waits, in his capacity as Deputy Adjutant General of the 1st Armored Division, had prepared the report of Mrs. Villanueva's death and letters of condolence to her next of kin. His knowledge was limited to the medical cause of death, identity of the victim and next of kin, and similar administrative information. Captain Everett had begun reading a newspaper account but stopped when he read the appellant's name. At that point he had read only that a woman had been raped and killed and that a motion to dismiss for lack of speedy trial had been denied.

The record clearly reflects that the court members had only vague and general knowledge that an incident characterized as a rape and murder had occurred. Their actual and specific knowledge about the reported facts of the case was less than the information on the charge sheet. We are satisfied from their responses on the record that all members were mentally free to render an impartial finding and sentence based upon the law and the evidence. Accordingly, we conclude that the assigned error is without merit. *See United States v. McQueen*, 7 M.J. 281 (C.M.A.1979); *United States v. Boyd*, 7 M.J. 282 (C.M.A.1979); *United States v. Parker*, 6 U.S.C.M.A. 274, 284–85, 19 C.M.R. 400, 410–11 (1955).

## V. FAILURE OF THE MILITARY JUDGE TO RECUSE HIMSELF.

The appellant contends that the military judge should have recused himself, *sua sponte*, after refusing to accept the appellant's tender of pleas of guilty to premeditated murder and rape. We disagree.

At the outset, this case must be distinguished from cases in which the military judge rejects a guilty plea after conducting an inquiry into the factual basis for the plea. In this case, the military judge summarily rejected the tendered plea without making any factual inquiry because he was

5. The appellant's individual civilian counsel at trial also represented the appellant before this

Court, filing a brief and participating in oral argument.

prohibited from receiving a guilty plea to a capital offense. Article 45(b), UCMJ, 10 U.S.C. § 845(b) (1976).

 Even in a bench trial, a military judge is not required to recuse himself after rejecting a guilty plea if he has not gained factual knowledge of the offenses charged and has not been required to reach conclusions regarding the accused's factual and legal guilt. *United States v. Cooper*, 8 M.J. 5 (C.M.A.1979). Furthermore, even in cases where the military judge has become "tainted" by his involvement in a rejected plea of guilty, he has the option either to recuse himself or to direct a trial with members. *See United States v. Bradley*, 7 M.J. 332, 334 (C.M.A.1979). Since this case was a trial with members, recusal was not required.

We note that in this case the appellant persisted in his request for trial by judge alone even after the judge rejected the appellant's efforts to enter pleas of guilty. Of course, the military judge denied the request for a bench trial because of the jurisdictional limitations imposed by Article 18, UCMJ, 10 U.S.C. § 818 (1976). Nevertheless, the appellant's persistence in a request for a bench trial demonstrates his absence of any real concern regarding the impartiality of the military judge during the trial. Our review of the record of trial convinces us that the military judge remained impartial and scrupulously fair throughout the trial.

Accordingly, we conclude that the military judge did not err by failing to recuse himself after refusing to receive the appellant's pleas of guilty.

## VI. DENIAL OF THE RIGHT TO PLEAD GUILTY.

 The appellant contends that he was denied his "constitutional right to plead guilty." There is no absolute constitutional right to plead guilty. *See Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971); *North Carolina v. Alford*, 400 U.S. 25, 38, n. 11, 91 S.Ct. 160,

167, n. 11, 27 L.Ed.2d 162 (1970); *Lynch v. Overholser*, 369 U.S. 705, 719, 82 S.Ct. 1063, 1072, 8 L.Ed.2d 211 (1962); *but cf. United States v. Gaskins*, 485 F.2d 1046 (D.C.Cir. 1973) (rejection of guilty plea under F.R. Crim.P. Rule 11 may be abuse of discretion); *United States v. Williams*, 43 C.M.R. 579 (A.C.M.R.1970) (arbitrary rejection of guilty plea without legal basis is abuse of discretion). Unlike the civilian federal courts, there is no statutory right to plead guilty in a military capital case. To the contrary, in the Uniform Code of Military Justice, Congress has prohibited a guilty plea to a capital offense. Article 45(b), UCMJ, 10 U.S.C. § 845(b) (1976).

 There was no possibility of an abuse of discretion with respect to the proffered guilty plea to premeditated murder because the military judge's discretion had been removed by Article 45(b). However, with respect to the charge of rape, the answer is less clear.

In *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the Supreme Court held the death penalty to be disproportionate and excessive for rape of an adult woman. The case involved a Georgia statute making rape punishable by death if the jury found at least one of the following statutory aggravating circumstances: (1) that the rape was committed by a person with a prior record of conviction for a capital felony; (2) that the rape was committed while the offender was engaged in the commission of another capital felony, or aggravated battery; or (3) the rape "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim."

The prosecution alleged and the jury found the first two circumstances but not the third. Justices White, Stewart, Blackmun and Stevens concluded that the death penalty was excessive for the rape of an adult woman even though the jury had found two of the three statutory aggravating circumstances. Justices Brennan and

Marshall concurred on the ground that the death penalty is *per se* unconstitutional.[6]

 Accordingly, we conclude that a plea of guilty lawfully could have been received by the military judge, since the Supreme Court had effectively invalidated that portion of Article 120, UCMJ, making rape a capital offense. However, we find no abuse of discretion in the cautious approach taken by the military judge in this case.

The essence of the appellant's complaint is that Article 45(b) precludes him from presenting himself to the sentencing authority as one who is contrite and has taken the first step toward rehabilitation. However, in this case the military judge instructed the court members that in their deliberations on the sentence they should consider, among numerous other factors, that "the accused in this case had, to the extent allowed by law, entered a plea of guilty. His plea of guilty may be considered by you as a manifestation of repentance and may be the first step towards rehabilitation."

In light of the military judge's instruction, we find the appellant's assertion that he was deprived of the opportunity to appear contrite and a good candidate for rehabilitation to be without merit.

## VII. MOTION FOR MISTRIAL BASED UPON IMPROPER OPENING STATEMENT BY THE TRIAL COUNSEL.

The appellant contends that the military judge erred by denying a motion for mistrial based on inflammatory remarks by the trial counsel during his opening statement.

In his opening statement, the trial counsel informed the court members of his intention to prove that the appellant had repeatedly expressed a desire to brutally rape a woman. The trial counsel further informed the court members of his intention to prove that the appellant tortured Mrs. Villanueva before killing her. Immediately at the conclusion of the trial counsel's opening statement and at several other times throughout the trial, the military judge cautioned the court members not to regard the trial counsel's assertions as evidence. Out of the presence of the court members, after the trial counsel's opening statement and the military judge's first cautionary instruction, the individual defense counsel moved for a mistrial.

 The question whether to declare a mistrial rests within the discretion of the military judge. A mistrial is an extreme remedy, but is appropriate when circumstances arise that cast substantial doubt on the fairness of the trial. When a request for mistrial is based upon information improperly brought before the court members, a mistrial should be granted if the effects of such information cannot be removed by an instruction to disregard it. Paragraph 56e(1), MCM, 1969 (Rev.).

 In his opening statement, a trial counsel is permitted to make a brief statement of the issues to be tried and what he expects to prove, but he must avoid "including or suggesting matters as to which no admissible evidence is available or intended to be offered." Paragraph 44g(2), MCM, 1969 (Rev.). The opening statement should be limited to matters "which the prosecutor believes in good faith will be available and admissible." American Bar Association Standards for Criminal Justice, Standard 3–5.5 (2d ed. 1980). Where the evidence actually adduced falls short of the trial counsel's promises, we must consider all of

---

**6.** Justice Powell concurred in holding the death penalty disproportionate in Coker's case but did not believe that the Court should foreclose the death penalty for all rape cases, and he criticized Justice White's opinion for being too broad. Justice White, the author of the plurality opinion, subsequently characterized the holding of *Coker* in the following words: "under the Eighth and Fourteenth Amendments, death is an excessive penalty *for a rapist who does not also commit murder.*" (Emphasis added.) *Godfrey v. Georgia*, 446 U.S. 420, 453, n. 4, 100 S.Ct. 1759, 1764, n. 4, 64 L.Ed.2d 398 (1980) (White, J. dissenting). Justice White's later characterization of his own *Coker* opinion indicates that his view may be closer to that of Justice Powell than to the views of Justices Stewart, Blackmun and Stevens.

the surrounding circumstances, including whether the matters referred to were significant, whether the trial counsel intentionally misstated the evidence and the likelihood that the statements would have influenced or inflamed the court members. *See United States v. Grandy*, 11 M.J. 270, 275 (C.M.A.1981).

With regard to the trial counsel's assertion that he would prove that the appellant had "repeatedly" expressed a desire to "brutally" rape a woman, it is clear that the trial counsel's proof fell short of his promises, proving neither that the statements were made "repeatedly" nor that they encompassed "brutally" raping a woman. Unfortunately, the trial counsel was dependent upon Specialist Bagwell, a reluctant witness, a friend of the appellant, and an accessory after the fact, to prove his point. The most that the trial counsel could elicit from Bagwell was that, on one occasion approximately two weeks before the rape and murder, the appellant had stated that he would like to rape a woman, and that he had told Bagwell how he would like to do it. However, Bagwell did not relate to the court how the appellant said he would like to commit the rape.

■ In view of the trial counsel's apparent good faith and the repeated admonitions by the military judge that statements of counsel are not evidence, we are satisfied that the military judge's curative instructions were an adequate remedy for the trial counsel's overstatement of his case, and that the military judge did not abuse his discretion by declining to invoke the drastic remedy of a mistrial.

■ As for the trial counsel's reference to torture, the military judge instructed the court members to disregard all references by the pathologist to "torture wounds" because the pathologist could not testify with reasonable medical certainty, based upon his examination of Mrs. Villanueva's body, that the wounds were inflicted to torture her. However, the prosecution presented ample evidence, including the appellant's admissions to Bagwell, which would support an inference that Mrs. Villanueva was tortured before she was killed. Accordingly, we conclude that the reference to torture in the trial counsel's opening statement was not improper.

## VIII. NOTICE OF GRANTS OF IMMUNITY.

The appellant contends that he was not given reasonable notice of the grants of immunity to three prosecution witnesses. The three government witnesses, Specialist Turner, Specialist Hughley, and Specialist Bagwell, testified after they had been granted testimonial immunity. Each had declined to testify at the Article 32 investigation. All three grants of immunity were issued by the convening authority on 18 June 1979 and the defense was notified on the following day, which was two days before the trial commenced and nine days before the witnesses testified. Trial sessions were held on four of the intervening nine days.

■ The defense must be notified of a grant of immunity within a reasonable time before the witness testifies. The remedies for violation of this rule are to "grant a continuance until such time as is necessary to obtain compliance, prohibit testimony by the person to whom the grant of immunity has been given, or enter such other order as may be required." *United States v. Webster*, 1 M.J. 216, 221 (C.M.A. 1975).

In this case, the defense was provided with copies of the sworn statements of Turner, Hughley and Bagwell which were considered by the Article 32 investigating officer. At the trial, the individual defense counsel did not request a continuance. To the contrary, he informed the military judge that he did not consider any remedy short of dismissing the charges to be appropriate.

■ We believe that, in this case, nine days was a "reasonable time" between the required notification to the defense and the witnesses' testimony, especially in view of the fact that the court-martial was not in session on five of those days. We find this assignment of error without merit.

## IX. SUFFICIENCY OF THE EVIDENCE OF PREMEDITATION.

The appellant contends that the evidence is insufficient to prove that the murder of Mrs. Villanueva was premeditated. Since the appellant providently pleaded guilty to unpremeditated murder, the only factual issue presented to the court members was the issue of premeditation. The appellant argues that the testimony of Major Reed regarding the appellant's low intelligence, suicidal tendencies, explosive personality, alcoholism, as well as evidence that the appellant was drinking prior to the murder, and evidence of the appellant's failure to conceal his bloody clothing and hands after the murder, considered together are sufficient to raise a reasonable doubt about his ability to premeditate. We disagree.

On the issue of intoxication, Private Hughley testified that the appellant had been drinking on the afternoon of 27 February. However, Specialist Turner, Specialist LaRue and Private Hughley all testified that the appellant did not appear intoxicated when they saw him shortly after the murder.

Although the appellant made no effort to conceal his blood-spattered appearance from his fellow soldiers in the unit, he took elaborate precautions to avoid detection by law enforcement personnel. He retrieved the six-pack of beer which he believed to bear his fingerprints, gave away Mrs. Villanueva's watch, attempted to burn the blood spots from his sweat pants, concealed his tennis shoes by throwing one shoe onto the roof of one building and the other shoe onto the roof of another building, asked Specialist LaRue to conceal a blood-stained sweater, and told Specialist Bagwell to throw away the scissors and Mrs. Villanueva's keys and to burn her shoes.

The appellant's murder of Mrs. Villanueva was preceded by elaborate preparations. The appellant waited until the library was empty, tricked Mrs. Villanueva into walking to the back of the library, removed the entrance key from her desk, locked the entrance, and wore gloves to avoid leaving fingerprints. Although he took precautions against leaving fingerprints, he made no effort to conceal his face, indicating that he did not intend to leave a victim who could identify him.

Lastly, the brutal nature of the attack on Mrs. Villanueva is evidence of premeditation. The evidence showed that Mrs. Villanueva, while partially unclothed and moving throughout the library, was sufficiently terrified to involuntarily defecate near the front entrance, in front of the librarian's desk, and again at the apparent place of her death. The bottoms of her feet were soiled, indicating that she had walked or run after her shoes had been removed. The appellant stated that Mrs. Villanueva made him angry because "she wouldn't move right" while he was raping her, and so he poked her with the scissors and stabbed her in the face. He hit her in the left eye with a blunt object, probably his fist. Finally, the appellant inflicted 53 stab wounds, including 6 lethal wounds, and after she was already dead, attacked her sexual organs with the scissors. "[T]he vicious assaults resulting in multiple grievous injuries bespeak a premeditated design to kill." *United States v. Harris*, 6 U.S.C.M.A. 736, 741, 21 C.M.R. 58, 63 (1956); *accord, United States v. Ayers*, 14 U.S.C.M.A. 336, 34 C.M.R. 116 (1964); *see generally* 2 Wharton's Criminal Law (14th Edition, 1979), § 140.

We are satisfied beyond a reasonable doubt that the appellant had a premeditated design to kill Mrs. Villanueva, as evidenced by his elaborate preparations as well as by the brutal manner in which she was killed.

## X. ADMISSION OF PHOTOGRAPHS OF THE VICTIM.

The appellant contends that the military judge erred by admitting eight photographs of the victim, because "the only effect . . . was to appeal to the emotions of the court members and invite prejudice and bias toward the appellant." We find his contention without merit.

Of the 19 photographs of Mrs. Villanueva proffered by the prosecution, only 8 were admitted.

Prosecution Exhibits 3 and 4 are black and white photographs of Mrs. Villanueva as she was found by her husband. They show her lying on her back in a pool of blood, barefoot and nude from the waist down. Her face, neck and chest are covered with blood.

Prosecution Exhibits 14, 16, 20, 23, 24 and 26 are color photographs of Mrs. Villanueva which were taken at the pathology laboratory after her body had been cleaned of blood and excrement.

Prosecution Exhibit 14 shows the stab wounds on Mrs. Villanueva's face, neck, chest and abdomen. Prosecution Exhibit 16 is a close-up of Mrs. Villanueva's face, showing the blunt force injury to her left eye, and stab wounds in the face and left side of the neck. Prosecution Exhibit 20 is a close-up of the fatal wound to the right side of the neck, a wound on the chin, and several other neck wounds.

Prosecution Exhibit 23 is an extreme close-up of the stab wound and scratches in Mrs. Villanueva's pubic hair. Prosecution Exhibit 24 shows stab wounds in the side and back. Prosecution Exhibit 26 shows defense wounds on Mrs. Villanueva's hand.

■ We believe that the photographs were relevant because they tended to establish the appellant's premeditated design to kill. *See United States v. Ayers*, 14 U.S.C.M.A. 336, 34 C.M.R. 116 (1964); *United States v. Harris*, 6 U.S.C.M.A. 736, 741, 21 C.M.R. 58, 63 (1956); *United States v. Riggins*, 2 U.S.C.M.A. 451, 9 C.M.R. 81 (1953) (viciousness of the attack may prove premeditated design to kill).

Furthermore, the photographs served to illustrate the testimony of the pathologist and to prove the nature of the wounds and the cause of death. *See United States v. Bartholomew*, 1 U.S.C.M.A. 307, 314, 3 C.M.R. 41, 48 (1952); *United States v. Tua*,

4 M.J. 761 (A.C.M.R.1977), *pet. denied*, 5 M.J. 91 (C.M.A.1978); *United States v. Moore*, 33 C.M.R. 868, 877–78 (A.F.B.R.), *pet. denied*, 33 C.M.R. 436 (C.M.A.1963).

Finally, we note that the military judge was extremely circumspect in his rulings on the admissibility of the photographs. The two photographs of Mrs. Villanueva as she was found by her husband are in black and white. The color photographs show Mrs. Villanueva's body in clinical surroundings after her wounds had been cleaned. They do not magnify or exaggerate the wounds. The military judge admitted only the minimum number of photographs necessary to illustrate the testimony of the pathologist.

■ The admission of photographs is a matter within the military judge's discretion. His ruling should not be overturned unless there is a clear abuse of discretion. *See United States v. Thomas*, 6 U.S.C.M.A. 92, 97, 19 C.M.R. 218, 223 (1955); *United States v. Bartholomew, supra*; *United States v. Tua, supra*; *United States v. Montgomery*, 5 M.J. 832, 834 (A.C.M.R.), *pet. denied* 6 M.J. 89 (C.M.A.1978); *United States v. Noreen*, 48 C.M.R. 228 (A.C.M.R. 1973), *affirmed* 23 U.S.C.M.A. 212, 49 C.M.R. 1 (1974); *United States v. Coleman*, 36 C.M.R. 574 (A.B.R.1965), *pet. denied* 36 C.M.R. 541 (C.M.A.1966). We believe that the military judge's rulings in this case were well within the limits of sound discretion.

XI. DEFENSE COUNSEL'S CONCESSION OF THE APPELLANT'S GUILT OF RAPE.[7]

In his opening statement, made after the prosecution had rested, the individual defense counsel stated:

Under the law, he cannot plead guilty to rape as it is specified. However, I tell you candidly from the outset, Private Matthews does not in fact deny raping the victim on February 27 of this year.

7. Two briefs were filed in this case, one by appointed defense counsel and one by the individual civilian counsel who had represented the

appellant at the trial. This assignment of error was filed by appointed defense counsel.

So what you have before you is a situation where the accused comes before you admitting unpremeditated murder, and also admitting rape as specified.

The defense tactic was simple: to focus on the issue of premeditation. The individual defense counsel had cross-examined the government psychiatrist at length to develop evidence tending to show that the appellant, because of his limited intelligence, acute alcoholism, explosive personality, and intoxication, could not and did not premeditate the murder of Mrs. Villanueva.

The defense case consisted of testimonial and documentary evidence of the appellant's history of alcoholism. In closing arguments, the individual defense counsel conceded that the appellant stabbed and raped Mrs. Villanueva, but concentrated his argument on the issue of premeditation, dwelling at length on the appellant's limited intelligence, alcoholism and personality disorders, characterizing the appellant as a person capable of "doing but not thinking."

■ The appellant now contends that the military judge erred by allowing the individual defense counsel to admit the appellant's guilt of rape, contrary to appellant's plea of not guilty. We disagree.

We believe that, under the circumstances of this case, the individual defense counsel's trial tactics were not only proper but a realistic approach to a difficult case. Faced with overwhelming evidence, he wisely chose to focus the court's attention on what he perceived to be the weakest point of the government's case. Persuading the court that the murder was not premeditated was the appellant's only hope of avoiding a mandatory sentence to either life imprisonment or death.

Furthermore, under the circumstances of this case, we do not believe that the military judge was required to question the appellant and obtain his express consent to his counsel's trial tactics.

This court previously has held that the defense "may in an appropriate case concede that the Government has met its burden on one of several charges in order to emphasize the asserted weakness of the remaining charges," so long as the defense counsel does not concede an issue contrary to the testimony of the accused and does not concede guilt in the face of a defense raised by the accused in his testimony. *United States v. Caldwell*, 9 M.J. 534, 536 (A.C.M.R.1980); *see United States v. Henderson*, 44 C.M.R. 553, 556 (A.F.C.M.R.), *pet. denied*, 21 U.S.C.M.A. 599, 44 C.M.R. 939 (1971); *United States v. Buchanan*, 37 C.M.R. 927 (A.F.B.R.), *pet. denied*, 17 U.S.C.M.A. 646, 37 C.M.R. 470 (1967); *Turberville v. United States*, 303 F.2d 411 (D.C.Cir. 1962); *but see United States v. Smith*, 8 U.S.C.M.A. 582, 25 C.M.R. 86 (1958) (concession improper where it conflicted both with plea of not guilty and accused's testimony).

■ Under appropriate circumstances, concessions by counsel "are not only proper, but highly commendable." *Tatum v. United States*, 190 F.2d 612, 618 (D.C.Cir.1951). Although rape is a serious offense, it clearly was the less serious of the two offenses before the court in this case. To concede a lesser offense in an effort to avoid conviction of a greater offense is a proper and legitimate trial tactic. The fact that it was unsuccessful does not make it any less proper. *United States v. Caldwell, supra*, at 536.

■ The appellant argues that his counsel conceded his guilt of a capital offense, thereby subverting the purpose of Article 45(b), which prohibits receiving a guilty plea to a capital offense. We disagree with the appellant's characterization of rape as a capital offense. As noted in Part VI of this opinion, *supra*, Article 120 authorizes the death penalty for rape, but the provision has been effectively invalidated by the United States Supreme Court holding that the death penalty is so disproportionate to the crime that it constitutes cruel and unusual punishment for the offense of rape of an adult woman. *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). Accordingly, we are satisfied that conceding the appellant's guilt of rape did not contravene Article 45(b).

■ The appellant argues that the military judge should have conducted an inquiry to determine whether the appellant agreed with and understood his counsel's tactics. We do not believe that an inquiry was required in this case. The appellant cites the opinion of the Court of Military Appeals in *United States v. Hampton*, 16 U.S.C.M.A. 304, 36 C.M.R. 460 (1966), in support of his argument. In *Hampton* the Court of Military Appeals observed that "the concession demanded interrogation of the accused concerning his agreement thereto, as well as his understanding of its meaning and effect as a virtual plea of guilty." *Id.* at 461. However, in *Hampton* the Court was confronted with a total concession of guilt to the only specification before the trial court. The *Hampton* opinion relies heavily on *Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966), in which the defense counsel totally capitulated, presenting no evidence and cross-examining no witnesses. The defense counsel in *Brookhart* told the trial court at the outset that he would neither offer any evidence nor cross-examine any of the prosecution witnesses. The Supreme Court found that the defense counsel had improperly overridden his client's expressed desire to plead not guilty and had foreclosed his client's constitutional rights to confrontation and cross-examination.

The *Hampton* decision subsequently has been interpreted as stopping short of establishing a *per se* rule requiring inquiry of the appellant in all cases involving concessions by counsel. *See United States v. Caldwell*, *supra*, at 536; *United States v. Buchanan*, *supra*, at 934.

Unlike the situations in *Brookhart* and *Hampton*, the appellant in this case retained and vigorously exercised his constitutional rights to confront and cross-examine the witnesses against him. Unlike *Brookhart* and *Hampton*, this case involved a tactical decision to concede a less serious offense in an effort to avoid conviction of a more serious offense.

Unlike *Brookhart* and *Hampton*, the appellant in this case attempted to plead guilty to the offense which his counsel conceded; unlike *Brookhart*, the appellant did not contradict his counsel's proposed tactics, even though he had ample opportunity to do so during the lengthy colloquy with the military judge regarding his plea of guilty to unpremeditated murder. The appellant in this case has never disavowed his counsel's concession of guilt. To the contrary, he argues before this court that he should have been permitted to enter a plea of guilty to rape. (Part VI of this opinion.)

The record in this case shows that (1) at the time of trial the appellant desired to plead guilty to rape; (2) the appellant was advised generally of the meaning and effect of a guilty plea in connection with his guilty plea to unpremeditated murder; (3) since the prosecution presented its entire case and the defense cross-examined the prosecution witnesses at length, it is clear that the appellant exercised rather than waived his constitutional rights of confrontation and cross-examination with respect to the charge of rape; and (4) the individual defense counsel, faced with overwhelming evidence, wisely chose to focus the court's attention on what he perceived to be the weakest point in the government's case, *i.e.*, the issue of premeditation. Under the circumstances of this case, we hold that the military judge did not err by permitting the defense counsel to concede the appellant's guilt of rape, nor did he err by failing to obtain the express personal consent of the appellant to his counsel's trial tactics.

## XII. THE CONSTITUTIONALITY OF THE DEATH PENALTY.

The appellant contends that his death sentence violates the Eighth Amendment prohibition against "cruel and unusual" punishments, because the Uniform Code of Military Justice fails adequately to insure that the appellant falls into a category for which the legislature has prescribed death as a just penalty, the sentencing decision was not sufficiently controlled to avoid arbitrariness and discrimination, the court members were not given sufficient guidance regarding the factors which are rele-

vant to sentencing, and there is no meaningful basis for distinguishing military cases in which the death penalty was imposed from those in which it was not. *See Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

A. *Constitutional Standards for Imposing the Death Penalty.*

██ It is clear that the framers of the Constitution did not intend to prohibit the imposition of the death penalty in all cases.[8] Likewise, the drafters of the earliest American military legal systems contemplated that the death penalty would be imposed in certain cases.[9] It is well settled that a sentence violates the Eighth Amendment proscription against "cruel and unusual" punishment if it is grossly disproportionate and excessive to the offense for which it is imposed. *Cf., Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596 (1958) (loss of citizenship excessive punishment for desertion); *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910) (sentence to 12 years in chains with loss of civil rights for life excessive for falsifying public documents). A majority of the Supreme Court has recognized that the death penalty is not *per se* disproportionate for murder. Only two justices of

the Supreme Court have taken the position that the death penalty is *per se* cruel and unusual punishment. *Furman v. Georgia*, 408 U.S. 238, 257, 92 S.Ct. 2726, 2735, 33 L.Ed.2d 346 (Brennan, J., concurring), 314 (Marshall, J., concurring). Therefore, we decide this case on the premise that the death penalty is not absolutely prohibited by either the Eighth Amendment or Article 55 of the Uniform Code of Military Justice.[10] However, we must also decide whether the death sentence in this case was imposed in accordance with constitutionally acceptable procedures.

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Georgia and Texas procedures for imposing the death penalty were struck down as violative of the Eighth Amendment proscription against cruel and unusual punishments. *Furman* involved three persons sentenced to death, one in Georgia for murder and one for rape, and one in Texas for rape. Each of the five Justices voting to strike down the Georgia and Texas procedures filed a separate opinion, leaving the state of the law unclear.

Justices Brennan and Marshall found the death penalty *per se* unconstitutional for any criminal offense.

8. The framers of the Constitution specifically provided for the death penalty. *See* United States Constitution, Amendment V ("No person shall be held to answer for a capital, or otherwise infamous crime ... nor be deprived of life, liberty, or property, without due process of law ...."). For a detailed history of the death penalty, see *Furman v. Georgia*, 408 U.S. 238, 242–257, 92 S.Ct. 2726, 2728–2735, 33 L.Ed.2d 346 (1972) (Douglas, J. concurring); *id.* at 258–306, 92 S.Ct. at 2736–2760 (Brennan, J. concurring); *id.* at 316–374, 92 S.Ct. at 2765, 2796 (Marshall, J. concurring).

9. The death penalty appears as an authorized punishment in the Massachusetts Articles of War of 1775, considered the first American Code of military criminal law. Winthrop, Military Law and Precedents 22 (1895, 1920 reprint). The death penalty was retained in the American Articles of War of 1776 and each of the subsequent revisions of the Articles of War in 1806, 1874, 1916, 1920 and 1948. *Id.*, Appendices X–XIII; 39 Stat. 630–70 (1916); 41 Stat. 759–812 (1920); 62 Stat. 627–44 (1948). When the Articles of War were replaced with

the Uniform Code of Military Justice, 64 Stat. 107–49 (1950), the death penalty was retained, and was carried over into the 1968 revisions of the Uniform Code of Military Justice, 10 U.S.C. §§ 801–940 (1968), which are currently in effect.

10. Article 55, UCMJ, 10 U.S.C. § 855 (1976), parallels the Eighth Amendment. It provides as follows:

> Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by any court-martial or inflicted upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited.

However, it is clear that Congress did not intend to absolutely prohibit the death penalty, since it is specifically authorized in Articles 85, 90, 94, 99–102, 104, 106, 110, 113, 118 and 120, UCMJ, 10 U.S.C. §§ 885, 890, 894, 899–902, 904, 906, 910, 913, 918 and 920 (1976).

Justice Douglas found that, because the procedures by which the death penalty was imposed allowed unfettered jury discretion, they were "pregnant with discrimination and discrimination is an ingredient not compatible with the idea of equal protection of the laws that is implicit in the ban on 'cruel and unusual' punishments." *Id.* at 256–57, 92 S.Ct. at 2735–36 (Douglas, J., concurring).

Justice Stewart found that the Georgia and Texas procedures gave the jury unguided discretion, which permitted the death penalty to be "so wantonly and so freakishly imposed." He found that death sentences were imposed under the Georgia and Texas laws then in effect in such a manner to be "cruel and unusual." *Id.* at 309–10, 92 S.Ct. at 2762–63 (Stewart, J., concurring).

Justice White found that no valid purpose was served by the death penalty under the laws in question because it was being used so rarely that it had ceased to be a credible deterrent. He was concerned that there was no apparent meaningful basis for distinguishing the few cases in which the death penalty was imposed from the many in which a lesser sentence was imposed. *Id.* at 311–14, 92 S.Ct. at 2763–64 (White, J., concurring).

The *Furman* decision made it clear that a system of completely unguided jury discretion in imposing the death penalty was unconstitutional. However, the Court gave no clear guidance concerning what was required to survive constitutional muster.[11]

In *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Supreme Court upheld a death sentence imposed under Florida law, revised in response to *Furman*, which prescribes a bifurcated trial at which, following a conviction of first-degree murder, a separate sentence hearing is required if the defendant is convicted of first-degree murder. First-degree murder includes premeditated murder, felony-murder, and murder resulting from heroin distribution. Fla.Stat.Ann. § 782–04(1) (Supp. 1976–77). At the sentence hearing, the jury is directed to determine whether the death sentence should be imposed by balancing specific statutory aggravating factors[12] against specific statutory mitigat-

11. Two of the dissenting justices in the *Furman* case opined that the capital punishment provisions of the Uniform Code of Military Justice may have been overturned by the plurality opinion. Justice Blackmun remarked, "Also in jeopardy, perhaps, are the death penalty provisions in various Articles of the Uniform Code of Military Justice." *Furman v. Georgia*, 408 U.S. 238, 412, 92 S.Ct. 2726, 2815, 33 L.Ed.2d 346 (1972) (Blackmun, J. dissenting). Justice Powell was less tentative, stating, "numerous provisions of the Criminal Code of the United States and of the Uniform Code of Military Justice also are voided." *Id.* at 417–18, 92 S.Ct. at 2817–18 (Powell, J., dissenting). However, these remarks clearly were dicta, spoken to reinforce the position that the Court had improperly encroached on the role of the legislature. Two years later, in *Schick v. Reed*, 419 U.S. 256, 267–68, 95 S.Ct. 379, 385–86, 42 L.Ed.2d 430 (1974), a majority of the Court declined to decide whether *Furman* applies to courts-martial. Justices Marshall, Douglas, and Brennan dissented, stating that *Furman* invalidated the death penalty provisions of Article 118, UCMJ. *Id.* at 271, 95 S.Ct. at 387. A contrary view is expressed in *United States v. Denson*, 588 F.2d 1112, 1121 n. 9 (5th Cir. 1979) (Article 118, UCMJ, not affected by *Furman*).

12. The aggravating factors are:

 (a) The capital felony was committed by a person under sentence of imprisonment.

 (b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

 (c) The defendant knowingly created a great risk of death to many persons.

 (d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

 (e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

 (f) The capital felony was committed for pecuniary gain.

 (g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

 (h) The capital felony was especially heinous, atrocious, or cruel.

Fla.Stat.Ann. § 921.141(5) (Supp.1976–1977).

ing factors.[13] The jury determination is made by majority vote and is not binding on the judge, who actually imposes sentence. If a death sentence is imposed, the judge must make written findings regarding the aggravating and mitigating factors relied upon in imposing a death penalty. A death sentence is subject to automatic appellate review.

Justices Stewart, Powell and Stevens found that the Florida procedure adequately insured "an informed, focused, guided and objective inquiry" into the question whether the death penalty should be imposed. Justice White, joined by Chief Justice Burger and Justice Rehnquist found that "although the statutory aggravating and mitigating circumstances [set out in the Florida statute] are not susceptible of mechanical application, they are by no means so vague and overbroad as to leave the discretion of the sentencing authority unfettered." *Proffitt, supra,* 428 U.S. at 260,

96 S.Ct. at 2970. Justice White also observed that "[t]here is good reason to anticipate, then, that as to certain categories of murderers, the penalty will not be imposed freakishly or rarely but will be imposed with regularity ...." *Id.* Justice White was satisfied that the Florida statute eliminated his concern that the death penalty was neither a credible deterrent nor did it contribute to any other end of punishment in the criminal justice system. *See Furman v. Georgia, supra,* 408 U.S. at 311, 92 S.Ct. at 2763 (White, J., concurring).

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court upheld a death sentence imposed after the Georgia procedures were revised in response to *Furman.* The revised Georgia procedure also provides for a bifurcated trial. However, in Georgia the jury's determination is binding. The sentencing authority must find at least one of ten statutory aggravating factors,[14] and is enti-

---

**13.** The mitigating factors are:

(a) The defendant has no significant history of prior criminal activity.

(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(c) The victim was a participant in the defendant's conduct or consented to the act.

(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.

(e) The defendant acted under extreme duress or under the substantial domination of another person.

(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(g) The age of the defendant at the time of the crime.

Fla.Stat.Ann. § 921.141(6) (Supp.1976–1977). Subsequent to *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Florida legislature added another aggravating factor. *See* Fla.Stat.Ann. § 921.141(5)(i) (Supp. 1981).

**14.** The Georgia statute provides in part:

(a) The death penalty may be imposed for the offenses of aircraft hijacking or treason, in any case.

(b) In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any

mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence:

(1) The offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions.

(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree.

(3) The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor

524

tled to consider any other relevant nonstatutory aggravating factor as well as any relevant mitigating circumstances. The mitigating factors are not specified by statute. Georgia provides for special appellate review to determine whether the death sentence was influenced by passion, prejudice, or other arbitrary factors; whether the evidence supports the sentencing authority's finding regarding the aggravating circumstances; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. Georgia Code Ann. § 27–2537 (Supp.1975).

The Court concluded that the Georgia statutory scheme, requiring a finding of at least one statutory aggravating factor, an opportunity to consider mitigating factors, and an expanded scope of appellate sentence review, was sufficient to overcome the *Furman* objections to the previous Georgia procedure.

In *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) the Court upheld a death sentence imposed under procedures substantially different from Florida and Georgia. Texas procedure also prescribes a bifurcated trial. However, rather than specify aggravating factors to be considered after findings, Texas specifies five categories of murder as "capital": murder committed in the course of certain felonies, murder for remuneration, murder of a peace officer, murder committed while escaping or attempting to escape from a penal institution, and murder of a prison employee by a prison inmate. Tex. Penal Code, § 19.03 (1974). If a defendant is convicted of capital murder, then the jury may impose a death sentence only if it finds, by unanimous verdict, (1) that the conduct of the defendant was committed deliberately and with the reasonable expectation that death would result, (2) that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, and, (3) if raised by the evidence, that the defendant's conduct in killing the deceased was an unreasonable response to the provocation, if any, by the deceased. Texas Code Crim.Proc. Art. 37.071(b). In essence, the three jury questions require each juror to determine whether, because of the nature and circumstances of the offense as well as the background and character of the defendant,[15] the death penalty should be imposed. Like Florida and Georgia, Texas requires that a death sentence be subject to special appellate review.

In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Bell v. Ohio*, 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978), the Ohio death penalty was struck down. The Ohio statutes prescribed a bifurcated trial. A death penalty for murder was precluded when one or more of three mitigating factors was established by the defendant: that the victim induced or facilitated the killing, that it was unlikely that the offense would have been committed but for the fact that the defendant was under duress, coercion, or strong provocation; or

---

or former district attorney or solicitor during or because of the exercise of his official duty.

(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

(8) The offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another. Ga.Code Ann. § 27–2534.1 (Supp.1975).

15. Although the three post-sentencing questions appear to restrict the matters which the jury may consider, the second question has been construed by the Texas courts as broad enough to include factors such as the defendant's age, background, mental capacity and emotional state. *See Jurek v. Texas*, 428 U.S. 262, 272–73, 96 S.Ct. 2950, 2956–57, 49 L.Ed.2d 929 (1976); *see also Jurek v. State*, 522 S.W.2d 934, 939–40 (Tex.Crim.App.1975).

that the offense was primarily the product of the defendant's psychosis or mental deficiency, even though such mental condition was insufficient to establish the defense of insanity. Ohio Stat. § 2929.03–.04. The statute was interpreted by the Ohio court to require the death penalty if the defendant did not prove at least one of the mitigating factors by a preponderance of the evidence. A plurality of the Court, consisting of Chief Justice Burger and Justices Stewart, Powell and Stevens concluded that the Ohio procedure was defective because it limited the mitigating factors to be considered to the three set out in the statute, and thereby precluded consideration of other relevant factors such as the defendant's age, previous record, cooperation with law enforcement authorities, and degree of participation in the offense.

The requirement that the sentencing authority consider all relevant mitigating factors was reiterated in *Eddings v. Oklahoma*, —— U.S. ——, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), in which a death sentence was set aside because of the trial judge's refusal to consider evidence of the defendant's difficult family history and emotional disturbance.

In *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the Court struck down statutes mandating the death penalty for certain classes of cases. N.C. Gen.Stat. § 14–21 (Cum.Supp.1975); La. Rev.Stat.Ann. § 14:30 (1974 Supp.). Justices Stewart, Powell and Stevens found that a mandatory death sentence was contrary to contemporary standards for imposing capital punishment, that it amounted to an arbitrary, standardless imposition of the death sentence, and that it impermissibly precluded consideration of mitigating factors regarding the character and personal history of the defendant. Justices Brennan and Marshall adhered to their position that the death penalty was *per se* unconstitu-

tional. *Woodson v. North Carolina*, 428 U.S. at 306–07, 96 S.Ct. at 2992–93 (Brennan, J., dissenting), 307 (Marshall, J., dissenting); *Roberts v. Louisiana*, 428 U.S. at 336, 96 S.Ct. at 3007 (Brennan, J., dissenting), 336–37, 96 S.Ct. 3007–08 (Marshall, J., dissenting).

▮▮▮▮. Several broad conclusions may be drawn from the Supreme Court decisions regarding the death penalty:

First, wholly unguided jury discretion in imposing a death sentence is impermissible;

Second, a mandatory death penalty is impermissible;[16]

Third, specific focus upon aggravating and mitigating factors at the sentencing stage is constitutionally required;

Fourth, proof of some relevant aggravating circumstance is a prerequisite for a death sentence, although the circumstance may be somewhat imprecise and subjective, *e.g.*, that the offense was "outrageously or wantonly vile, horrible and inhuman" (Ga. Code Ann. § 27–2534.1(b)(7)), or "especially heinous, atrocious, or cruel" (Fla.Stat.Ann. § 921.141(5)(h) (Supp. 1976–1977));

Fifth, the sentencing procedure may allow the aggravating circumstance to be found either in connection with findings or during the sentencing phase of the trial;

Sixth, the sentencing procedure must allow consideration of all relevant mitigating factors, although it is not necessary that these be specifically enumerated by statute or otherwise;

Seventh, the Supreme Court looks with favor on a bifurcated trial, because it allows a more comprehensive basis for sentencing by relaxing the rules of evidence and by allowing a defendant to present mitigating evidence during the sentencing phase even though such evidence would have been detrimental to his case before findings;

Eighth, when sentencing is by a jury, the trial judge must provide guidance as to the factors which are relevant to the sentencing

---

**16.** Whether the Supreme Court would uphold a mandatory death penalty in wartime, based upon military exigency or some other special justification, is uncertain. *See* Article 106, UCMJ, 10 U.S.C. § 906 (1976) (mandatory death penalty for wartime spying).

decision and the proper means for applying those factors to the determination of sentence; and

Ninth, the Supreme Court looks with favor on a mandatory appeal system to safeguard against arbitrary, prejudicial, disproportionate, or inconsistent sentencing.

The drafters of the Model Penal Code have summarized the requirements as follows: "What is required ... is a system that allows submission to court or jury of the evidentiary basis for whatever mitigation may exist. This opportunity, when coupled with a limitation of capital punishment for murder to certain specified circumstances of aggravation, apparently suffices to withstand constitutional scrutiny." American Law Institute Model Penal Code and Commentaries (1980 edition), § 210.6, paragraph 12d, p. 167. In short, "the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." *Proffitt v. Florida, supra,* 428 U.S. at 258, 96 S.Ct. at 2969.

B. *The Military System.*

■ Comparison of the requirements imposed by the Supreme Court for imposition of the death penalty with the procedures mandated by the Uniform Code of Military Justice and the Manual for Courts-Martial [17] convinces us that the procedures mandated for courts-martial to impose a death sentence for premeditated murder are sufficiently focused and guided to pass constitutional muster.

In order to impose the death sentence for murder, a court-martial must find either that the murder was premeditated or that it occurred while the offender was "engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson." Article 118, UCMJ, 10 U.S.C. § 918 (1976). All other forms of murder or homicide are punishable only by lesser penalties.[18]

While in courts-martial the required aggravating circumstance must be found as part of the findings, similar to the Texas procedure, the Supreme Court has sanctioned such a procedure as the functional equivalent of a statutory aggravating factor to be considered during the sentencing phase of the trial. "While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose." *Jurek v. Texas, supra,* 428 U.S. at 270, 96 S.Ct. at 2955.

A trial by court-martial is a bifurcated proceeding. The court members are not advised of the maximum sentence until after findings, meaning that they may not know that they are considering a capital offense until after findings, unless they are alerted by the questions during voir dire.

The court members are entitled to consider the facts and circumstances of the

---

17. The rules of evidence and procedure for courts-martial are prescribed by the Manual for Courts-Martial, which has been promulgated by Executive Order 11476, 19 June 1969, reprinted at 3 CFR, 1966–70 Comp. pp. 802–03. The full text of the Manual for Courts-Martial, United States, 1969 (Revised edition) is at 34 Fed.Reg. 10503, 28 June 1969. Article 36, UCMJ, 10 U.S.C. § 836 (Supp. III 1979) delegates to the President the authority to prescribe the procedure, including modes of proof, in cases before courts-martial.

18. Article 118 is more restrictive in defining capital murder than the laws of Georgia, Florida or Texas. Only premeditated murder and felony murder are designated as capital by Article 118. Georgia designates as capital all degrees of murders, including felony murder. Ga. Code Ann. § 26–1101 (1972). Florida designates as capital premeditated murder, felony murder, and death caused by heroin distribution. Fla.Stat.Ann. § 782.04(1) (Supp.1976–1977). Texas designates as capital all types of murder encompassed by Article 118, including felony murder, murder resulting from an act intended to inflict grievous bodily harm, and murder resulting from an act clearly dangerous to human life. Tex.Penal Code § 19.02(a) (1974).

offense as aggravating factors. Paragraph 76a(2), MCM, 1969 (Rev.). This is comparable to the nonstatutory and unspecified aggravating factors which may be considered under the Georgia statute approved by the Supreme Court in *Gregg v. Georgia, supra.*

Regarding the character and background of the accused, the prosecution is limited to matters properly contained in the accused's personnel records. Records of previous military convictions or nonjudicial punishment are admissible only if the records show compliance with procedural rules, including those giving the accused an opportunity to consult with counsel and to obtain appellate review. Paragraph 75*b, d*, MCM, 1969 (Rev.).

On the other hand, the accused has broad latitude after findings to submit mitigating evidence, including evidence of good character and good military performance, as well as evidence regarding extenuating circumstances of the offense. The accused has broad rights of allocution, with the option of testifying under oath or avoiding cross-examination by making an unsworn statement, either in person or through counsel. Paragraph 75*c*, MCM, 1969 (Rev.). The rules of evidence are relaxed during sentencing to permit the accused broad latitude in presenting extenuating and mitigating evidence. Paragraph 75*c*(1), MCM, 1969 (Rev.); *see* Mil.R.Evid. 1101(c) (applicable to cases tried after 1 September 1980).

Like the Georgia and Texas statutes, the UCMJ and the Manual for Courts-Martial do not specify which mitigating factors may be considered, although the Manual for Courts-Martial does contain nonexclusive examples of appropriate matters to be con-sidered. *See* paragraph 76a(2), MCM, 1969 (Rev.). In courts-martial an accused has virtual *carte blanche* to present whatever he desires in extenuation and mitigation.

A military judge is required to instruct the court members prior to their deliberations on sentencing.[19] His instructions must be specific and tailored to the evidence. *See* paragraph 76*b*(1), MCM, 1969 (Rev.). All court members must concur in a death sentence, and their decision is binding on the military judge.[20]

After the trial, the command staff judge advocate, an experienced military lawyer, must review the proceedings and provide the general court-martial convening authority with a written review of the proceedings, which must include the staff judge advocate's opinion regarding the legal sufficiency of the proceedings, including the legality and appropriateness of the sentence, along with the reasons for his conclusions. Article 61, UCMJ, 10 U.S.C. § 861 (1976); paragraph 85, MCM, 1969 (Rev.). Prior to submitting his written review to the convening authority, the staff judge advocate must submit the review to the accused and his counsel for comment and rebuttal. *United States v. Goode*, 1 M.J. 3 (C.M.A. 1975).

The convening authority has unfettered clemency authority, but may approve the sentence only if he is convinced beyond a reasonable doubt of the accused's guilt and is convinced that the sentence is appropriate. Article 64, UCMJ, 10 U.S.C. § 864 (1976). The requirement for review and approval by the convening authority helps to assure that sentences for similar crimes

---

**19.** We note that, unlike civilian juries, military juries usually are not inexperienced in sentencing. Military officers regularly sit as court members. They act as convening authorities, summary courts-martial and investigating officers, and, when in command, they impose nonjudicial punishment. They are not randomly selected but rather are individually selected as being "best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Article 25, UCMJ, 10 U.S.C. § 825 (1976). This difference was recognized by a majority of the Supreme Court in *Schick v. Reed*, 419 U.S. 256 (1974), where Chief Justice Burger raised but did not answer the question whether *Furman* applies to "death sentences imposed by military courts where the asserted vagaries of juries are not present as in other criminal cases?" 419 U.S. at 260, 92 S.Ct. at 2737. *Accord, United States v. Denson*, 588 F.2d 1112, 1119 n. 6 (5th Cir. 1979).

**20.** An accused does not have the option of a trial by judge alone in a capital case. Article 18, UCMJ, 10 U.S.C. § 818 (1976).

will not be disproportionate within his or her command.

If the convening authority approves a death sentence (or certain lesser sentences), the accused is entitled to several levels of automatic appellate review, with qualified counsel provided at government expense, in addition to any counsel provided by the accused. The case is first considered by a Court of Military Review, which has a broad mandate to approve only such findings and sentence "as it finds correct in law and fact" and "on the basis of the entire record, [finds] should be approved." Article 66, UCMJ, 10 U.S.C. § 866; paragraph 100a, MCM, 1969 (Rev.). Unlike most civilian appellate courts, the Courts of Military Review have independent fact-finding authority. They may not affirm a finding of guilty based upon a conclusion merely that the findings of the trial court are reasonably supported by the evidence of record, but rather they must be convinced of the appellant's guilt beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Peek v. United States,* 321 F.2d 934 (9th Cir. 1963); *cert. denied* 376 U.S. 954, 84 S.Ct. 973, 11 L.Ed.2d 973 (1964); *compare* Article 66, UCMJ, 10 U.S.C. § 866 and paragraph 100a, MCM, 1969 (Rev.) *with* Fla.Stat.Ann. § 921.141(4) (Supp. 1976–77), Ga. Code Ann. § 27–2537(c)(3) (Supp.1975), and Tex.Code Crim.Proc. Art. 37.071(f) (Supp.1975–76). Also unlike most other appellate courts, the Courts of Military Review are charged with the review of the appropriateness of sentences. The legislative history of Article 66

clearly reflects Congressional intent that this power will be exercised to avoid excessive or disproportionate sentences throughout the armed forces for similar offenses. *See* H.R.Rep. No. 491, 81st Cong., 2d Sess.; S.Rep. No. 486, 81st Cong., 2d Sess., reprinted in (1950) U.S.Code Cong.Service 2222, 2254; *see also United States v. Judd,* 11 U.S.C.M.A. 164, 169–70, 28 C.M.R. 388, 393–94 (1960) (Ferguson, J., concurring).

 In cases involving a death sentence, we construe the mandate of Article 66 to require a Court of Military Review to be satisfied that (1) the statutory aggravating factor, as well as all other elements of the capital offense, have been proven beyond a reasonable doubt by competent evidence of record; (2) the statutory and nonstatutory aggravating factors in the case outweigh the mitigating factors; and (3) that the death sentence is not excessive or disproportionate, considering both the nature and circumstances of the offense, the aggravating and mitigating factors, and the background and character of the appellant.[21]

If the death sentence is affirmed by the appropriate Court of Military Review, then review by the United States Court of Military Appeals is mandatory. Article 67(b), UCMJ, 10 U.S.C. § 867(b). The Court of Military Appeals has a more restricted appellate role, but nevertheless serves as a check against arbitrary or capricious sentencing. *See United States v. Dukes,* 5 M.J. 71, 72–74 (C.M.A.1978); *United States v.*

---

**21.** Military appellate courts normally must confine their review to the record. In cases where extra-record materials are offered for consideration, opposing counsel must be given an opportunity to object to consideration of such materials or to rebut them. Rules of Practice and Procedure, Courts of Military Review, Rule 23. Some civilian appellate practices that are less protective of an appellant have received tacit Supreme Court approval. The United States Supreme Court recently refused to consider the cases of 123 Florida inmates sentenced to death who complained that the Florida Supreme Court had "engaged in the continuing practice of requesting and receiving information concerning capital appellants which was not presented at trial and not a part of the

trial record or record on appeal. The information includes . . . presentence investigation reports concerning the capital offense under review or prior convictions unrelated to the capital offense; psychiatric evaluations or contact notes (made in the correctional system after conviction); psychological screening reports; recitations of a capital defendant's refusal to submit to psychiatric examination from which a report could be prepared; post-sentence investigation reports; probation or parole violation reports; and state prison classification and admissions summaries." *Brown v. Wainwright,* 392 So.2d 1327, 1332–1333 (Fla.), *cert. denied,* —— U.S. ——, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981).

*Christopher*, 13 U.S.C.M.A. 231, 236–37, 32 C.M.R. 231, 236–37 (1962).

Finally, even if a death sentence is affirmed by the courts, it may not be executed unless approved by the President. Article 71(a), UCMJ, 10 U.S.C. § 871(a). Unlike civilian jurisdictions where the sentence will be executed unless affirmative action is taken by the executive to stay or commute the sentence, in military cases the President must expressly and affirmatively approve a death sentence.

Although Congress has specifically designated certain offenses as capital, it has not prescribed all the procedures for imposing a death sentence, but rather has delegated to the President the authority to prescribe the rules of procedure for courts-martial. Article 36, UCMJ, 10 U.S.C. § 836 (Supp.III 1979). The President has exercised that power by promulgating the Manual for Courts-Martial. Unlike state courts who look to the legislature for procedural rules, courts-martial look primarily to rules prescribed by the President. Such rules, of course, have the force of law so long as they are not inconsistent with the UCMJ.

Although the Supreme Court has indicated that the legislature must determine what criminal acts shall be punishable by death, it has not required that all aggravating or mitigating factors be legislatively determined. To the contrary, the Supreme Court has held that relevant but unspecified non-statutory aggravating factors may be considered. The Court has approved the Georgia and Texas procedures, which permit consideration of non-statutory aggravating factors and which do not specify the mitigating factors. *See Gregg v. Georgia, supra; Jurek v. Texas, supra.* Furthermore, the Supreme Court has held that relevant non-statutory mitigating factors must be submitted to the sentencing authority even where the legislature has specified certain mitigating factors by statute. *Lockett v. Ohio, supra.*

Finally, the Supreme Court has held that state courts may define or redefine statutory criteria which are facially too vague or indefinite. Considering the Georgia statute, which permits a death sentence upon a finding that the offense was "outrageously or wantonly vile, horrible and inhuman," the Court found that this criterion, as interpreted by the Georgia Supreme Court, was sufficiently precise to preclude arbitrary death sentences. *Gregg v. Georgia, supra.* However, four years later the Supreme Court struck down the Georgia Supreme Court's application of the same standard as too broad, but did not invalidate the Georgia statutory procedure itself. *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The Supreme Court took a similar approach with regard to the vagueness of the aggravating and mitigating factors in the Florida statutes, relying on the Florida Supreme Court to apply them rationally and consistently. *Proffitt v. Florida, supra*, 428 U.S. at 255–56, 96 S.Ct. at 2968. On the other hand, the Supreme Court has construed the facially restrictive sentencing criteria of Texas in a manner broad enough to comport with constitutional requirements. *Jurek v. Texas, supra*, 428 U.S. at 272–73, 96 S.Ct. at 2956–57.[22]

█ It is clear from the Supreme Court's opinions in *Gregg, Jurek, Lockett,* and *Godfrey* that the procedural protections against arbitrary imposition of the death penalty need not be founded solely in legislative enactment but may rest in part upon judicial application of general legislative guidelines. Although the capital sentencing procedures considered by the Supreme Court have all been promulgated by the state legislatures—the only entities empowered to do so in civilian criminal systems— the Supreme Court has concerned itself with the substantive content of the procedural rules, not their source. Accordingly, we perceive no Constitutional infirmity in

---

22. Similarly, a federal district court has held that a listing of statutory mitigating circumstances which facially is too restrictive may be interpreted by the state supreme court in a less restrictive manner so as to comport with the Constitution. *Knapp v. Cardwell*, 513 F.Supp. 4, 11–14, (D.C.Ariz.1980).

the fact that the procedures by which a court-martial imposes a death sentence are not prescribed entirely by legislative enactment, but are prescribed in part by executive order, which has the force and effect of law, and by appellate court decisions interpreting and applying the procedural rules.

We are satisfied that the procedures prescribed for courts-martial in capital cases sufficiently guide and focus the sentencing decision to survive Constitutional scrutiny. A court-martial is required to find at least one statutory aggravating circumstance before it may consider imposing the death sentence for murder. During the sentencing phase of the bifurcated trial, the prosecution is entitled to present or draw attention to certain limited categories of non-statutory aggravating circumstances. The accused, on the other hand, has broad latitude in presenting extenuating and mitigating factors. The military judge is required to further focus the jury's attention by specific instructions tailored to the evidence. Lastly, if a death sentence is imposed, the sentence is subject to several levels of review to insure fairness and consistency.

These procedural safeguards are virtually identical to the Texas procedure, about which a plurality of the Supreme Court commented as follows:

> We conclude that Texas' capital-sentencing procedures, like those of Georgia and Florida, do not violate the Eighth and Fourteenth Amendments. By narrowing its definition of capital murder, Texas has essentially said that there must be at least one statutory aggravating circumstance in a first-degree murder case before a death sentence may even be considered. By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function. By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution.

*Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976). Accordingly, we conclude that the military criminal system provides a procedure for imposing the death penalty which, like the Texas procedure, does not violate the Constitution.[23]

The fact that the Uniform Code of Military Justice and the Manual for Courts-Martial, unlike most state statutes, have not been amended in response to the Supreme Court decisions does not undermine their constitutionality. Military sentencing procedures have always been more focused and guided than civilian procedures. While it can be argued that special more restrictive rules should be prescribed for trials of capital cases by court-martial, the test that we apply in this case is whether capital sentencing procedures for courts-martial

---

**23.** The Supreme Court has not considered the capital punishment provisions of the federal murder statute (Title 18, United States Code, § 1111). However, the federal courts appear to have accepted, usually without detailed analysis, the proposition that *Furman* invalidated the death penalty provisions in Title 18. *See, e.g., United States v. Dufur*, 648 F.2d 512 (9th Cir. 1980); *United States v. Denson*, 588 F.2d 1112 (5th Cir. 1979); *United States v. Kaiser*, 545 F.2d 467 (5th Cir. 1977); *United States v. Weddell*, 567 F.2d 767 (8th Cir. 1977); *United States v. Watson*, 496 F.2d 1125 (4th Cir. 1973); *United States v. Woods*, 484 F.2d 127 (4th Cir. 1973), *cert. denied* 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974). In one of the few cases to set out a detailed explanation, the Court in *Kaiser* held that narrowing the categories of murder is insufficient, "absent clearly defined channels of sentencing discretion focusing on the particularized circumstances of the crime and the offender...." *Kaiser, supra*, at 474. A comparison of the detailed listing of sentencing considerations in paragraphs 75 and 76, MCM, 1969 (Rev.) with the absence of any guidelines in Rules 31 and 32 of the Federal Rules of Criminal Procedure convinces us that the constitutional shortcomings of 18 U.S.C. § 1111 are not found in trials by courts-martial.

satisfy constitutional requirements, not whether they could be improved. Although the Supreme Court requires that the sentencing process in a capital case be carefully focused and guided, we do not read the Supreme Court decisions as requiring that capital sentencing be accomplished by procedures different from non-capital sentencing. The fact that lesser sentences are imposed with the same care as capital sentences does not necessarily affect the constitutionality of the capital sentencing procedures.

C. Procedures Followed in this Case:

In this case the appellant was charged with and convicted of premeditated murder in violation of Article 118(1), UCMJ, an offense designated by Congress as a capital offense. Since the military judge was forbidden to receive a guilty plea to a capital offense, the prosecution was required to prove the statutory aggravating element, *i.e.*, premeditation, beyond a reasonable doubt. The appellant having pleaded guilty to unpremeditated murder, the issue of premeditation was squarely presented to the court members. After receiving proper instructions from the military judge, they found the element of premeditation beyond a reasonable doubt.

The prosecution was then offered the opportunity to present other non-statutory aggravating factors authorized by the Manual for Courts-Martial, such as prior convictions or nonjudicial punishment. No such factors were presented. In accordance with paragraph 75*b* of the Manual, the prosecution informed the court members of the appellant's age, length of service, term of service, marital status, pay, and the nature and duration of the pretrial restraint. In accordance with paragraph 75*d* of the Manual, the prosecution then presented the appellant's DA Form 2 and DA Form 2–1, which summarized additional data in his personnel records such as assignments and promotions.

As required by *United States v. Hawkins*, 2 M.J. 23 (C.M.A.1976) and paragraph 75*e* of the Manual, the military judge advised the appellant of his right to present evi-

dence in extenuation and mitigation and to testify, or to make an unsworn statement, oral or written, personally or through counsel, or to remain silent. The appellant chose to remain silent, but he did present the testimony of his sister, who testified about the appellant's deprived childhood, the death of his father, and his concern for his mother's poor health.

In argument on sentence, the individual defense counsel reminded the court members of the evidence received before findings regarding the appellant's mental state on the day of the murder, his alcoholism, his low intelligence, his personality disorder, and his suicidal tendencies.

In his instructions, the military judge specifically informed the court members that they should consider the following extenuating and mitigating factors: the appellant's age, education, background, training, service record and family situation; the duration of his pretrial confinement; his pleas of guilty "to the extent allowed by law"; and the psychiatric testimony regarding his mental deficiency and personality disorders. Lastly, the military judge advised the court members that they should "select the sentence which would best serve the ends of good order and discipline, and the needs of the accused and the welfare of society." Although the military judge advised the court members that the maximum sentence included the death penalty, he advised them only of the aggregate maximum, not the sentences authorized for each offense. However, he did advise them of the statutory minimum sentence for premeditated murder. The appellant made no objection to the instructions, nor did he request additional instructions.

Thereafter the court members, by unanimous vote, imposed the death sentence.

All of the mitigating factors highlighted by the military judge are specifically authorized by paragraphs 75 and 76 of the Manual. By way of comparison, only three of them are enumerated in the Florida statute approved by the Supreme Court in *Proffitt, supra*: the appellant's age (§ 921.141(6)(g)); lack of criminal record (§ 921.-

141(6)(a)) and impaired mental ability (§ 921.141(6)(f)).

Because the military judge instructed the court members only on the aggregate maximum sentence, it is possible that the court members did not know whether the death penalty was authorized for each of the offenses or only for murder. However, the Supreme Court has refused to overturn death sentences based upon such theoretical uncertainty. *See Drake v. Zant*, 449 U.S. 999, 101 S.Ct. 541, 66 L.Ed.2d 297 (1980) (certiorari denied after Georgia Supreme Court held that they would not set aside a death sentence even though one of the aggravating factors found by the jury was constitutionally defective); *but see Zant v. Stephens*, 631 F.2d 397 (5th Cir. 1980), *cert. granted*, —— U.S. ——, 102 S.Ct. 90, 70 L.Ed.2d 82 (1981). Any likelihood that the court members in this case imposed the death sentence for rape instead of murder is purely speculative. At most, the court may have considered the rape as an aggravating circumstance of the murder.

■ We are satisfied that the sentencing decision in this case was properly focused and guided. The court was required to determine beyond a reasonable doubt whether the murder was accompanied by a statutory aggravating factor, i.e., premeditation. Having so found, they were then required to balance the seriousness of the offense against an exhaustive list of mitigating factors.[24] Given a choice only of life imprisonment or the death sentence, they were required to vote on the less severe sentence first if any member proposed the lesser sentence. All members were required to concur in the death sentence. The range of relevant factors submitted to the court equals or exceeds that of the procedures found acceptable by the Supreme Court. Accordingly, we conclude that the sentencing decision in this case was sufficiently focused and guided to avoid the "wanton" or "freakish" imposition of the death sentence.

**24.** This balancing test was adopted by Justices Stewart, Powell and Stevens in *Woodson v. United States*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). In that case the plurality stated that the Eighth Amendment "requires

## XIII. SENTENCE APPROPRIATENESS.

The appellant contends that the death sentence is not appropriate in this case because of his history of alcoholism and the fact that he was intoxicated when he raped and killed Mrs. Villanueva.

Even in the absence of a specific request by an appellant to reduce the sentence, our statutory mandate requires us to independently evaluate the appropriateness of the sentence and to affirm only such sentence or such part or amount of the sentence as we determine should be approved. Article 66, UCMJ, 10 U.S.C. § 866 (1976); paragraph 100, MCM, 1969 (Rev.). We have considered the facts and circumstances of the offenses, the appellant's age, family and educational background, military record, and mental and emotional condition, as well as the evidence of alcoholism and intoxication which was specifically urged for our consideration on appeal.

■ Our independent review of the record convinces us that, although the appellant apparently had been drinking on the afternoon of the incident, his degree of intoxication was insufficient to be noticed by witnesses who observed him shortly after Mrs. Villanueva was killed.

Furthermore, the record clearly shows that the murder of Mrs. Villanueva was calculated and deliberate, as evidenced by the appellant's preparations before attacking her. His attitude shortly after the murder was callous, as evidenced by his references to her as "that bitch," his attack on her sexual organs after her death, his taking of items of her clothing, and his retention of her intimate apparel even after disposing of other evidence. Lastly, the murder is one of the worst to come before this court in terms of its depravity, brutality and viciousness.

We are satisfied that the death penalty was not "freakishly" and "wantonly" im-

consideration of the character and record of the individual offender and the circumstances of the particular offense...." *Id.* at 304, 96 S.Ct. at 2991 (Stewart, J., joined by Powell and Stevens, JJ.).

posed. *See Furman v. Georgia*, 408 U.S. 238, 309–10, 92 S.Ct. 2726, 2762–63, 33 L.Ed.2d 346 (1972) (Stewart, Jr., concurring). We have no difficulty distinguishing this case from other cases in which a lesser sentence was imposed. *Cf., id.* at 311–14, 92 S.Ct. at 2763–64 (White, J., concurring). To the contrary, we are convinced that the death sentence is patently appropriate in this case.

## XIV. APPLICATION OF FORFEITURES.

Having decided that the death penalty was lawfully imposed as well as appropriate in this case, we must turn to one of the ancillary aspects of a death sentence, *viz.* the appellant's entitlement to pay and allowances while awaiting the execution of the sentence.

The convening authority in this case directed that the total forfeitures adjudged be applied to pay and allowances due on and after the date of his action. His action in this respect was incorrect.

Forfeitures may be applied to pay and allowances accruing on or after the date of the convening authority's action only if the sentence which was adjudged and approved includes "confinement not suspended"; otherwise, forfeitures may not take effect until the sentence is ordered executed. Article 57, UCMJ, 10 U.S.C. § 857 (1976).

 A death sentence imposed by a court-martial does not include confinement by implication, although it may be commuted to confinement. An accused found guilty of a violation of Article 118(1) or 118(4) "shall suffer death *or* imprisonment for life." (Emphasis added.) It is well settled that criminal statutes must be strictly construed. *See United States v. Halseth*, 342 U.S. 277, 280, 72 S.Ct. 275, 276, 96 L.Ed. 308 (1952); *United States v. Resnick*, 299 U.S. 207, 209, 57 S.Ct. 126, 127, 81 L.Ed. 127 (1936); *Ornelas v. United States*, 236 F.2d 392 (9th Cir. 1956). The word "or" indicates alternative punishments, only one of which may be imposed. Although the word "or" may be interpreted as meaning "and" if necessary to give effect to legislative intent, there is no indication that Congress intended "or" to mean "and" in this situation. *See generally* 73 Am.Jur.2d, Statutes, § 298; 82 C.J.S., Statutes, § 335.

The legislative history of Article 57 indicates that the Congress considered only the situation in which confinement and forfeitures were adjudged; they did not specifically consider the application of forfeitures in connection with a death sentence, nor did they consider whether both a death sentence and confinement could be adjudged. *See* H.R.Rep. No. 491, 81st Cong., 2d Sess.; S.Rep. No. 486, 81st Cong., 2d Sess., reprinted in (1950) U.S.Code Congressional Service, p. 2249. The provision for the alternative sentences of death or imprisonment for life first appeared in the Articles of War of 1916. The apparent intent of Congress at that time was merely to incorporate the language of the United States Code into the Articles of War. *See* S.Rep. No. 229, 63d Cong., 2d Sess., Letter of Major General E. H. Crowder, The Judge Advocate General, dated 12 April 1912. There is nothing in the legislative history of the United States Code to indicate that the death penalty and life imprisonment were not intended to be alternative punishments.

 Jurisdictions which consider confinement to be part of the death sentence do so because their criminal statutes specifically provide for confinement of the accused while he or she awaits execution of the death sentence. *See, e.g., People v. Rittger*, 55 Cal.2d 849, 13 Cal.Rptr. 406, 362 P.2d 38 (1961); *Wetzel v. Wiggins*, 226 Miss. 671, 85 So.2d 795, *appeal denied* 352 U.S. 807, 77 S.Ct. 80, 1 L.Ed.2d 39, *rehearing denied* 352 U.S. 919, 77 S.Ct. 217, 1 L.Ed.2d 125 (1956); *In re Watts*, 197 Cal. 611, 241 P. 886 (1925); *see also* 24B C.J.S., Criminal Law, Sec. 2001. Where the criminal statute does not specifically provide for confinement of an accused sentenced to death, confinement is considered a necessary incident of a death sentence but not a part thereof. *See McGinn v. State*, 46 Neb. 427, 65 N.W. 46 (1895); *see also* 21 Am.Jur.2d, Criminal Law, Sec. 606. Since Article 118,

UCMJ, does not specifically provide for confinement of an accused sentenced to death, we conclude that confinement is a necessary incident of the death sentence but not a part of it. The appellant is not serving a sentence to confinement, but rather is being confined "while being held for trial or the result of trial." Article 13, UCMJ, 10 U.S.C. § 813; paragraphs 18*b*(3), 19*d*, MCM, 1969 (Rev.). Confinement under the authority of Article 13 is imposed by a commander, not a judicial sentencing authority. Since the appellant is not serving a sentence to confinement, there is no authority to apply the forfeitures as of the date of the convening authority's action.[25] We will set aside that portion of the convening authority's action in our decretal paragraph.

## XV. CONCLUSION.

We are satisfied that the death penalty was imposed in accordance with the Constitution, the Uniform Code of Military Justice and the Manual for Courts-Martial. We are further satisfied, for the reasons stated above, that the death sentence is appropriate. Accordingly, the findings of guilty and the sentence are affirmed. However, that portion of the convening authority's action purporting to apply total forfeitures to pay and allowances becoming due on and after the date of his action is contrary to law and is set aside.[26]

Senior Judges CARNE and FULTON, and Judges MILLER, McKAY, LEWIS and COHEN concur.

Chief Judge HANSEN and Judge CLAUSE not participating.

**25.** This legislative oversight, and the anomalous results it produces in death penalty cases, was recognized by The Judge Advocate General of the Army as early as 1953, but corrective legislation never was enacted. *See* 1956 Cumulative Pocket Part to the Manual for Courts-Martial, United States, 1951, paragraph 126*a*.

**26.** Our decision affects only the pay and allowances accruing between 14 December 1979, the

MITCHELL, Senior Judge, concurring in part:

I join the majority in finding that the death penalty in this case was imposed under a permissible sentencing procedure and further that the imposition of the death sentence was appropriate.

I part company, however, on the question of the application of forfeitures as directed by the convening authority in his action. Judge Foreman, writing for the majority, finds that a death sentence does not include confinement by implication, although it may be commuted to confinement. He also concludes that the conjunction in "shall suffer death *or* imprisonment for life" indicates alternative punishments, only one of which may be imposed. But it is the bold assumptions and conclusions regarding the absence of implied confinement when the death penalty is adjudged and the Congressional intent when the Uniform Code of Military Justice was enacted, that forces me to disassociate myself from the majority. Specifically, I question its conclusion that forfeitures cannot be withheld from Matthew's pay.

Where the language and purpose of the questioned statute is clear, courts, of course, follow the legislative direction in interpretation. Where the words are ambiguous, the judiciary may properly use the legislative history to reach a conclusion. And that method of determining Congressional purpose is likewise applicable when the literal words would bring about an end completely at variance with the purpose of the statute. I suspect the majority's literal interpretation has done just that.

Neither counsel who argued the case for Matthews, either at trial or before us on appeal, contested the application of forfei-

date of the convening authority's action, and 1 August 1980, the last day of the appellant's term of enlistment. After 1 August 1980 the appellant was not entitled to pay and allowances, since none accrue to a service member serving in confinement under a sentence of death which is pending completion of appellate review. Department of Defense Military Pay and Allowances Entitlement Manual, 1 January 1967, as amended, paragraph 10317*i*.

tures. That is not to say that it cannot be considered for the first time upon our own option. The exact opposite is true, but to me today's decision raises more questions than it settles. I am therefore constrained to beware of hard construction and strained inferences especially if they appear to override common sense and traditional statutory purpose. It would require language so clear as to leave room for no other reasonable construction to induce the belief that Congress intended that confinement not be an inherent part of every sentence to death.

Accordingly, I would find that there was authority to apply the forfeitures as of the date of the convening authority's action.

JONES, Senior Judge, with whom Judge HANFT joins, dissenting in part:

I believe the death penalty in this case was imposed under an impermissible sentencing procedure, one which violates both the Eighth Amendment to the Constitution of the United States and Article 55 of the Uniform Code of Military Justice, 10 U.S.C. § 855.[1]

I

While I do not generally disagree with the majority's recitation of the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), or in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), *Roberts v.*

*Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) or *Bell v. Ohio*, 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978), I do find that the majority's analysis of these cases gives an incorrect picture of the Court's position regarding capital sentencing procedures. The majority's treatment of the law allows it to make a number of overly broad conclusions from which it then adjudges the military system constitutionally sufficient.

I do not dispute that death is a permissible punishment, both from a historical standpoint, *Gregg v. Georgia, supra* 428 U.S. at 176–178, 96 S.Ct. at 2926–2927, and in the current view of society, 428 U.S. at 179, 96 S.Ct. at 2928. The death penalty is not *per se* cruel and unusual punishment prohibited by the Eighth Amendment, 428 U.S. at 169, 96 S.Ct. at 2923.[2] The problem identified and found constitutionally objectionable in *Furman v. Georgia, supra*, was not the death penalty itself, but the procedures by which that penalty was imposed.

The message of *Furman* was clear—a sentence of death was constitutionally distinguishable from other punishment, and the sentencing procedure must reflect this. The decision abruptly changed the constitutional status of discretionary sentencing in capital cases. No longer were legislatures entitled to assume that jurors "decreeing death for a fellow human [would] act with due regard for the consequences of their decision." *McGautha v. California*, 402 U.S. 183, 208, 91 S.Ct. 1454, 1467, 28 L.Ed.2d 711 (1971).[3]

---

1. Col. Winthrop in his Military Law and Precedents, Second Edition, 1920 Reprint, stated that the Eighth Amendment to the Constitution did not apply to courts-martial but that the military observed the "cruel and unusual punishment" provision as a "general rule of practice". Winthrop at page 398. Whether the amendment is applicable directly or only through Article 55, UCMJ, it is now undisputed that the "cruel and unusual punishment" provision is applicable to the military justice system. *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249, 261 (1967); *United States v. Jobe*, 10 U.S.C.M.A. 276, 27 C.M.R. 350, 353 (1959).

2. Only Justices Brennan and Marshall would hold that the death penalty imposed under any and all conditions, violates the cruel and unusual punishment clause of the Eighth Amendment.

3. *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), dealt with capital sentencing in light of the Due Process clause of the Fourteenth Amendment and held that a jury was not required to be provided with standards to guide its decision whether to recommend a sentence of life imprisonment or death, nor that the capital sentencing proceeding was required to be separate from the guilt

Four years after *Furman*, the Supreme Court found that three states, Georgia, Florida, and Texas, had adequately responded to the objections of *Furman* and fairly met the Court's mandate for imposition of the death penalty in murder cases.[4] Each state created a mechanism whereby designated criteria were used to segregate from the infinite variety of offenses formerly considered capital murder, those offenses which the state deemed peculiarly deserving of the highest sanction. Only persons who were found to have committed an act of murder as further delimited by statute could be considered as a proper candidate for the death penalty.[5] Each state included a procedure whereby the sentencing body was directed to consider the propriety of capital punishment for the particular offender in one of the statutorily limited situations.

In each case the statutory scheme met the simple test articulated by Justice Stewart in *Gregg v. Georgia*:

[T]he concerns expressed in *Furman* that the penalty of death may not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information. 428 U.S. at 195, 96 S.Ct. at 2935.

### A. Georgia

In direct response to *Furman*, the Georgia legislature enacted a statutory scheme[6] which was upheld in *Gregg v. Georgia, supra*. The manner of sentencing under which Furman had been sentenced to death was not unlike that in any other capital case in the state. Unless the jury recommended mercy upon conviction of the capital offense, the sentence was death. The jury was so charged at the time it was instructed regarding the substantive offense. The Georgia courts had upheld this method against numerous attacks[7] as not in violation of the Eighth Amendment, but in

---

determination process. "*McGautha* was not an Eighth Amendment decision, and to the extent it purported to deal with Eighth Amendment concerns, it must be read in light of the opinions in *Furman v. Georgia*. There the Court ruled that death sentences imposed under statutes that left juries with untrammeled discretion to impose or withhold the death penalty violated the Eighth and Fourteenth Amendments." *Gregg v. Georgia*, 428 U.S. 153, 195, n.47, 96 S.Ct. 2909, 2935, n.47, 49 L.Ed.2d 859 (1976).

4. The offenses proscribed as murder in the Georgia, Florida, and Texas statutes are not identical. *See* Ga.Code Ann. § 26–1101 (1972), Fla.Stat.Ann. § 782.04 (Supp.1976–79), Tex.Penal Code § 19.02(a) (1974). Relevant portions of the Georgia, Florida, and Texas statutes are set out in an Appendix following this opinion.

5. In Georgia and Florida, the elements of the offense must be found to convict an accused of murder. During the sentencing phase, an additional finding must be made as a prerequisite to consideration of the death penalty as a sentencing option. *See* Ga.Code Ann. § 26–1101 (1972) and Fla.Stat.Ann. § 782.04 (Supp.1976–

1977) for the respective definitions of murder, and Ga.Code Ann. § 27–2534.1(b) and Fla.Stat. Ann. § 921.141(5) (Supp.1976–1977) for the respective aggravating factors. In order for a Texas jury to consider death as a sentencing option, findings must be made as to an intentional or knowing murder as defined in Tex.Penal Code § 19.02(a) and as to an additional circumstance listed in Tex.Penal Code § 19.03 (designating capital murders).

6. *See* Ga.Code Ann. § 27–2503 (Supp.1975), § 27–2514 (Supp.1975), § 27–2534 (1972), § 27–2534.1(b) (Supp.1975), § 27–2537 (Supp. 1975) and § 26–3102 (Supp.1975).

7. *See Miller v. State*, 226 Ga. 730, 177 S.E.2d 253, 255 (1970); *Williams v. State*, 226 Ga. 140, 173 S.E.2d 182, 184 (1970); *Manor v. State*, 223 Ga. 594, 157 S.E.2d 431, 437 (1967). These cases were subsequently vacated and remanded for consideration in light of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), respectively at 408 U.S. 938, 92 S.Ct. 2867, 33 L.Ed.2d 758 (1972); 408 U.S. 936, 92 S.Ct. 2879, 33 L.Ed.2d 753 (1972); 408 U.S. 935, 92 S.Ct. 2856, 33 L.Ed.2d 750 (1972).

fact, as the proper subject for the exercise of the jury's unfettered discretion.[8]

The defendant Gregg was convicted and sentenced under the new Georgia scheme. The legislature retained the former definition of murder including the authorized punishments, death or life imprisonment. As before, any person convicted of an unlawful killing with malice aforethought or of a killing in the commission of a felony could conceivably be sentenced to death. However, in contrast with the condemned practice, the sentencing authority (judge or jury) was required to hear additional evidence at a proceeding separate from the findings portion which preceded it, and to specifically consider mitigating and aggravating circumstances as they related to the death penalty. As a prerequisite to returning a death sentence, the sentencing authority had to find, beyond a reasonable doubt, the existence of one or more of ten statutorily specified aggravating circumstances. The particular aggravating circumstance found had to be specified in writing. The statutory scheme additionally provided for mandatory appellate review.[9]

The Supreme Court found the new procedures facially consistent with the Eighth Amendment because, contrary to previous practice, the jury's discretion was circum-scribed by legislative guidelines and channeled by consideration of the aggravating and mitigating factors. The Court repeatedly emphasized that, unlike *Furman*, the jury's attention was properly focused on the nature of the particular crime and on the particular characteristics of the individual defendant.[10]

### B. Florida

Florida's capital sentencing procedure had been directly affected by *Furman*. On the same day it announced the decision in *Furman*, the Supreme Court vacated nine Florida death sentences and remanded the cases for further proceedings in accordance with that decision.[11] Florida's then existing method of sentencing in capital cases was nearly identical to that of Georgia. Upon convicting an accused of a capital offense the jury was required to make one of two recommendations, "with mercy" or "without mercy". The jury was so charged at the same time it was instructed regarding the offense.

In response to *Furman*, Florida changed slightly its definition of murder and created a separate sentencing proceeding.[12] The Supreme Court addressed the new procedures in *Proffitt v. Florida, supra*, and compared them favorably with the Georgia enactments. Under the procedure, a jury was

8. *See Wyatt v. State*, 220 Ga. 867, 142 S.E.2d 810, 812 (1965). *See also Brawner v. State*, 221 Ga. 680, 146 S.E.2d 737, 741, *cert. denied*, 385 U.S. 936, 87 S.Ct. 298, 17 L.Ed.2d 216 (1966).

9. Georgia requires that the State Supreme Court review every death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the findings of a statutory aggravating circumstance, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Ga.Code Ann. § 27–2537 (Supp.1975).

10. "[The new Georgia] procedures require the jury to consider the circumstances of the crime and the criminal before it recommends sentence. No longer can a Georgia jury do as *Furman's* jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the specific circumstances of the crime .... In addition, the jury's attention is focused on the characteristics of the person who committed the crime." *Gregg v. Georgia*, 428 U.S. 153, 197, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976).

11. *Williams v. Wainwright*, 408 U.S. 941, 92 S.Ct. 2864, 33 L.Ed.2d 765 (1972); *Hawkins v. Wainwright*, 408 U.S. 941, 92 S.Ct. 2857, 33 L.Ed.2d 765 (1972); *Pitts v. Wainwright*, 408 U.S. 941, 92 S.Ct. 2856, 33 L.Ed.2d 765 (1972); *Boykin v. Florida*, 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972); *Johnson v. Florida*, 408 U.S. 939, 92 S.Ct. 2875, 33 L.Ed.2d 762 (1972); *Brown v. Florida*, 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972); *Anderson v. Florida*, 408 U.S. 938, 92 S.Ct. 2868, 33 L.Ed.2d 758 (1972); *Paramore v. Florida*, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972); *Thomas v. Florida*, 408 U.S. 935, 92 S.Ct. 2855, 33 L.Ed.2d 750 (1972).

12. *See* Fla.Stat.Ann. § 921.141 (Supp.1976–1977).

required to hear new evidence and make a recommendation as to the penalty, life or death, to the trial judge who actually determined the sentence. In so doing, the jury had to find beyond a reasonable doubt the existence of one or more statutory aggravating circumstances and weigh that against any mitigating factors it found to exist, including but not limited to seven mitigating circumstances enumerated by statute. Upon receiving the jury's recommendation the judge had to weigh the same factors and on that basis determine sentence.[13] If the judge imposed the death penalty he had to set forth in writing the statutory aggravation he found sufficient to require the ultimate sanction, and the mitigation he found insufficient to outweigh that judgment. Automatic appellate review was required, but, unlike Georgia, it took no specific form.[14]

After reviewing the Florida statute and the decisions thereunder, Justice Stewart announced approval in *Proffitt*:

> Florida, like Georgia, has responded to *Furman* by enabling legislation that passes constitutional muster. That legislation provides that after a person is convicted of first-degree murder there shall be an informed, focused, guided, and objective inquiry into the question of whether he shall be sentenced to death. 428 U.S. at 259, 96 S.Ct. at 2969.

### C. Texas

In a companion case to *Furman* the Supreme Court nullified the Texas capital sentencing procedure.[15] In response, Texas totally and somewhat uniquely revised its procedural and substantive criminal law, including its definition of murder.[16] In reviewing the new scheme, the Supreme Court characterized the revision as a "[narrowing of] the scope of its laws relating to capital punishment." *Jurek v. Texas, supra* 428 U.S. at 268, 96 S.Ct. at 2954.

Unlike Georgia where every murder (malice aforethought or felony killing) was a capital offense and Florida where only murders of the greatest culpability (premeditated design or in the commission or attempted commission of specific felonies) were designated as capital, Texas authorized death in a severely limited category of murder situations. Capital murder was defined as any murder of the highest culpable mental state (intentional or knowing) which occurs in one of five specific circumstances. Other intentional or knowing murders and any murder of lesser culpability are excluded at the findings stage from capital sentencing consideration.

Upon convicting of capital murder, the jury hears at a separate proceeding, relevant evidence and argument for and against the death penalty. The jury is charged with answering two (or in some instances three) specific questions,[17] the responses to which mechanically determine the sentence. However, the jury's function in responding to these questions is not mechanical. The questions require that the

13. "[T]he procedure to be followed by trial judges and juries is not a mere counting process of X number of aggravating circumstances, and Y number of mitigating circumstances but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present." *State v. Dixon*, 283 So.2d 1, 8 (Fla. 1973).

14. Fla.Stat.Ann. § 921.141 (Supp.1976–1977). *Cf.* n.9 *supra*.

15. *Branch v. Texas*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

16. *See* Tex.Code Crim.Proc., Art. 37.071 (Supp. 1975–1976).

17. Tex.Code Crim.Proc., Art. 37.071 (Supp. 1975–1976). The two questions to be answered in all instances are (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; and (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. The third question to be answered, if applicable, is whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation by the deceased.

jury assess the individual offense and individual offender with consideration of all relevant mitigating factors. This assessment must include the reasons "why a death sentence should be imposed" and "why it should not be imposed." 428 U.S. at 271, 96 S.Ct. at 2956.

The Supreme Court, in considering the Texas scheme,[18] likened the narrowly specified category of capital murders to the statutory aggravating circumstances found in the Georgia and Florida procedures. Because the five specific categories of capital murder served the same purpose as the statutory enumeration of aggravating circumstances, i.e., placing a limit on the circumstances in which a murder offense justifies the death penalty, 428 U.S. at 270, 96 S.Ct. at 2955, and focusing the sentencing authorities' attention on the particularized nature of the crime, 428 U.S. at 271, 96 S.Ct. at 2956, they withstood attack.

The Court further analyzed the manner in which the Texas scheme provided for consideration of mitigating circumstances. Because the "Texas statute does not explicitly speak of mitigating circumstances," 428 U.S. at 272, 96 S.Ct. at 2956, the Court focused on one of the three statutory questions which had to be answered by the jury. The Texas Court of Criminal Appeals had interpreted the question of "whether there [was] a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" as allowing the presentation of any mitigating circumstances the defendant might be able to show. The Court found that, as interpreted by the state courts, the Texas procedure sufficiently provided for consideration of mitigating circumstances.

The Supreme Court concluded that Texas' response to *Furman* was constitutionally sufficient:

Texas law essentially requires that one of five aggravating circumstances be found before a defendant can be found guilty of capital murder, and that in considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it ... [A]s in Georgia and Florida, the Texas capital sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death. 428 U.S. at 273–4, 96 S.Ct. at 2957.

### D. Summary

While each state responded to *Furman* in a distinct manner, distinguishable in a number of respects from the other two, the Supreme Court in *Gregg, Proffitt,* and *Jurek* seized upon features common to all in upholding the imposition of death under the respective schemes. Each state moved from a unitary proceeding to a bifurcated one. In each system further evidence particularly relevant to sentencing may be presented at the separate sentencing hearing. Before the death penalty may be imposed, each state requires the sentencing authority to consider factors specified by statute which, if present, would tend to increase the severity of the offense, and to find beyond a reasonable doubt the existence of at least one of those factors. This factor is required to be found in addition to finding the elements of murder as statutorily provided. Each state requires the consideration of evidence in mitigation, whether such mitigation is statutorily specified or not. Finally, each state requires that specific findings be made regarding the aggravating factor.[19]

18. Jurek was convicted under Tex.Penal Code, Art. 1256 (1973) (murder defined in terms of malice aforethought), and Tex.Penal Code, Art. 1257 (1973) (capital murder specified in terms of malice aforethought and five circumstances) which were in effect at the time Jurek committed his offense. The Supreme Court in reviewing his death sentence concentrated its discus-

sion of the Texas procedure on the statutes in effect at the time of its decision, Texas Penal Code § 19.02 (murder defined in terms of intentional or knowing) and § 19.03 (capital murder specified in terms of intentional or knowing and five circumstances).

19. In contrast to Florida and Georgia, the spe-

Although "each distinct system must be examined on an individual basis," *Gregg v. Georgia, supra* 428 U.S. at 195, 96 S.Ct. at 2935, it is significant that each of the approved systems corresponds to the approach suggested by the Court in *Gregg*. With this in mind we turn to an examination of the military system.

## II

### A. Trial Procedures

Murder is defined in Article 118 of the *Code*:

Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he—

(1) has a premeditated design to kill;

(2) intends to kill or inflict great bodily harm;

(3) is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life; or

(4) is engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson;

is guilty of murder, and shall suffer such punishment as a court-martial may direct, except that if found guilty under clause (1) or (4), he shall suffer death or imprisonment for life as a court-martial may direct. 10 U.S.C. § 918.

In order to be considered as a candidate for the death penalty by a court-martial, a murder defendant must be found guilty of premeditated murder, Article 118(1), or of felony murder, Article 118(4).[20]

If an accused is convicted of premeditated murder, the court-martial will proceed with the sentencing phase of the trial. Sentencing in a capital case differs only insignificantly from sentencing in a non-capital case. In the separate sentencing proceeding, the prosecution must read per-

cific finding is made under Texas law during the guilt determination phase. The aggravating factor must be pled and proved as part of the substantive offense of capital murder. In order to convict of capital murder as opposed to murder, the jury must find the aggravating factor as an element of the crime.

sonal data from the charge sheet, and may present evidence of previous convictions and matters from the accused's personnel records which reflect his past conduct and performance; evidence as to aggravating circumstances of the offense not introduced before findings may not be introduced at the sentencing phase; the accused is given great latitude to present matters in extenuation and in mitigation under relaxed rules of evidence; and after the presentation of evidence, both sides may argue for an appropriate sentence. *See* paragraph 75, *Manual for Courts-Martial*, United States, 1969 (Revised edition).

The military judge is required to instruct the members of the court-martial regarding their sentencing responsibilities. *See* paragraph 76, MCM, 1969 (Rev. ed.). He must tailor the instructions to the facts and circumstances of the individual case and must instruct that the members may consider all matters in extenuation and mitigation, as well as in aggravation, whether introduced before or after findings. The judge is also required to state the maximum and lesser punishments authorized and to "fully inform members of the court-martial on their sole responsibility for selecting an appropriate sentence." *Id.*, paragraph 76*b*. In a capital case the court-martial is further advised that in order to return a sentence of death, the determination of the members must be unanimous. *Id.*, paragraph 76*b*(3).

The majority today holds that these procedures sufficiently guide and focus the capital sentencing decision because: 1) "[a] court-martial is required to find at least one statutory aggravating circumstance . . ."— premeditation; 2) "[d]uring the sentencing phase of the bifurcated trial the prosecution is entitled to present or draw attention to certain limited categories of non-statutory aggravating circumstances"; 3) "[t]he accused . . . has broad latitude in presenting

**20.** My discussion will be limited primarily to sentencing in connection with premeditated murder since Matthews was convicted and sentenced on the basis of that offense.

extenuating and mitigating factors"; 4) "[t]he military judge is required to further focus the jury's attention by specific instructions tailored to the evidence"; and 5) "if a death sentence is imposed, the sentence is subject to several levels of review to insure fairness and consistency." In so holding, the majority finds the military procedures "virtually identical" to the Texas procedures upheld in *Jurek*. This conclusion misconceives the *Gregg, Proffitt* and *Jurek* opinions as well as that of *Furman v. Georgia.*

*Furman v. Georgia* denounced standardless sentencing discretion. In order to meet the concerns of *Furman*, a sentencing system must "define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion'." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980), quoting *Gregg v. Georgia, supra* 428 U.S. at 196, n.47, 96 S.Ct. at 2936, n.47. "It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance', and that 'make rationally reviewable the process for imposing a sentence of death'." *Godfrey v. Georgia, supra*, 446 U.S. at 428, 100 S.Ct. at 1765. Because a system may not preclude the sentencing body from considering any relevant matter in mitigation which the defendant proffers as a basis for a sentence less than death, *Lockett v. Ohio, supra*, the channeling function must be served by standardization of aggravating criteria required to be considered by each capital sentencing body.

The majority equates the naming of premeditation in Article 118(1) with the statutory delineation of the five categories of capital murder in the Texas procedure.

The five criteria in the Texas statute are roughly comparable to the aggravating criteria in the Georgia and Florida statutes.[21] Each set of criteria further limits the type of murders which may be considered as deserving of the death penalty. Premeditation, as an aggravating criterion, is not the equivalent of one of the capital murder categories in *Jurek* or the functional equivalent of the statutory aggravation in *Gregg* and *Proffitt* because it does not limit the cases of "first-degree murder" in which "a death sentence may be considered." *Jurek v. Texas*, 428 U.S. at 276, 96 S.Ct. at 2958. Furthermore, a particular criterion, in this case premeditation, cannot serve both to narrow the category of offenses for which the death penalty may be imposed and as the aggravating factor which justifies imposition of the death penalty within that narrowed category of offenses.

The Supreme Court has said of a statute similar to Article 118 that "the jury in its unbridled discretion could choose whether the convicted defendant should be sentenced to death or to life imprisonment." *Woodson v. North Carolina*, 428 U.S. 280, 285, 96 S.Ct. 2978, 2982, 49 L.Ed.2d 944 (1976). *Furman* and its progeny are a comment on the inadequacy of distinguishing between those murderers who deserve the death penalty and those who do not solely on the basis of traditional criteria (e.g., malice aforethought, premeditation). Traditional criteria permit the exercise of the unbridled discretion condemned by *Furman*.[22]

As an aggravating criterion premeditation fails to channel the sentencing decision in an objective or rational manner. Because a pattern of arbitrary and capricious sentencing like that found unconstitutional

---

**21.** The aggravating criteria of all three states include the following concepts: 1) the killing of a police officer or fireman who was in the performance of official duties; 2) a killing during the commission of a felony; 3) a killing for remuneration; 4) a killing in connection with escape from confinement or arrest; 5) a killing while the perpetrator was imprisoned. *See* Ga. Code Ann. § 27–2534.1(b) (Supp.1975), Fla. Stat.Ann. § 921.141(5) (Supp.1976–1977), Tex. Penal Code Ann. § 19.03 (Vernon 1974). *See*

*also* ALI, Model Penal Code § 210.6 (Proposed Official Draft 1962).

**22.** Eighty-six death sentences were vacated and the cases remanded by the *Furman* court. *See* 408 U.S. at 845, 932–942, 92 S.Ct. at 2845, 2845–2879, 33 L.Ed.2d 744, 745–765. Sixty-one of those death sentences were imposed under "premeditation" statutes existing in nineteen states.

in *Furman* could occur using the premeditation criterion as a sentencing standard, that criterion is constitutionally inadequate.[23] Premeditation is not a clear and objective standard, but an "amorphous" concept, *Woodson v. North Carolina*, 428 U.S. at 290–291, 96 S.Ct. at 2984–2985, which does not provide specific and detailed guidance to the court-martial. *See Proffitt v. Florida*, 428 U.S. at 253, 96 S.Ct. at 2967.

It is not denied that the military system generally satisfies the long recognized requirement that "for the determination of sentences, justice generally requires . . . that there be taken into account the circumstances of the offense together with the character and circumstances of the offender." *Gregg v. Georgia, supra* 428 U.S. at 189, 96 S.Ct. at 2932, quoting *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 60, 82 L.Ed. 43 (1937). Bifurcation facilitates the fair operation of this requirement. 428 U.S. at 191, 96 S.Ct. at 2933. Sentencing procedures in the military system ensure that relevant information will be provided to the court-martial under fair procedural rules. But that alone is not sufficient to guarantee that the information will be properly used in the imposition of the death penalty. *Gregg v. Georgia, supra* at 192, 96 S.Ct. at 2934.

The military system is deficient in not providing specific guidance to court members on the question of an appropriate sentence in a capital case. While the military judge must charge the court-martial that it may consider nonstatutory matters in aggravation, as well as in mitigation, he is neither required nor authorized to instruct as to what matters may be particularly aggravating in relation to the death penalty as opposed to any other punishment. Because there is a qualitative difference of constitutional dimension between a sentence of confinement and a sentence of death, there is a qualitative difference in those factors which may aggravate a sentence from one of years to one of life confinement and from one of life confinement to one of death.[24] In the context of the Eighth Amendment, a court-martial is provided with no guidance in determining an 'appropriate sentence' in a capital case.

In contrast to the procedures found constitutionally sufficient, the military scheme has no mandatory factors that must be found; no mandatory weighing of specific aggravating factors against mitigating factors; no requirement that the members make specific findings or answer specific questions; and above all, no specific consideration is directed to be given to the death penalty. Except for the unanimity requirement for voting, there is no distinction made between the sentencing procedure in a death case and that in any other case. The irreversible nature of the death penalty demands more.

### B. Appellate Review

Where a method of imposing the death penalty is found to violate the Eighth Amendment, no degree of appellate review can cure the constitutional deficiency in that capital sentencing procedure. Nonetheless, I believe a few comments are in order concerning appellate review in the military system.

The military scheme provides for an automatic appeal which is general in nature and without direction as far as capital cases are concerned. This Court "may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866 (1976). The Court's function in reviewing the sentence is to deter-

---

**23.** The establishment of standards does not necessarily guarantee that the sentencing decision will be properly channeled. A standard could be so broad as to result in a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman*. See *Gregg v. Georgia, supra* 428 U.S. at 195, n.46, 96 S.Ct. at 2935, n.46.

**24.** The sentencing procedures in the military allow for consideration in a capital case of aggravating matters as trivial as whether the accused has received nonjudicial punishment for being late to a formation or whether the accused has been convicted previously for an offense as minor as borrowing another person's property without permission.

mine its appropriateness. Such a nonspecific appellate review has been endorsed in capital cases only where the trial court received specific guideposts and the appellate court thus had definite, certain points to review. *See Proffitt v. Florida, supra* 428 U.S. at 258–59, 96 S.Ct. at 2969–70. Where the trial court is given no focus, as in the military, there is no standard for the appellate court to review. That the death sentence might be appropriate in a particular case is not sufficient; it must be appropriate when compared to the sentence imposed in other capital murder cases.[25]

### III

With my determination that the military scheme for the imposition of the death penalty is constitutionally infirm, I need not address the application of those procedures in this case. However, even if the military procedure had complied with constitutional requirements, its application in Matthews' trial would make the death sentence imposed an impermissible punishment. The deficiency lies in the instructions the military judge gave to the court members.

The *Manual* and the case law require the military judge to tailor his instructions on sentence to the law and to the facts and circumstances of the particular case. Paragraph 76b(1), MCM 1969 (Revised edition). *United States v. Slaton*, 6 M.J. 254 (CMA 1979); *United States v. Wheeler*, 17 U.S.C. M.A. 274, 38 C.M.R. 72 (1967). The military judge failed to do that here. No more perfunctory instruction could be imagined.

The judge repeated the litany of considerations from the *Manual* but he did not personalize them to this case. The closest he came was in saying that the members could consider the testimony of the psychiatrist concerning appellant's behavior disorder. Presumably this would serve to mitigate the sentence, but the judge did not instruct the court to this effect.[26] Except for a listing of the maximum sentence as death and the minimum as life imprisonment, the instructions could just as easily have been applicable to a simple larceny case. There was nothing to focus the court on any specific consideration in imposing the ultimate penalty.

I would affirm a sentence only to a dishonorable discharge, total forfeitures, reduction to E–1, and confinement at hard labor for life.[27]

### APPENDIX TO DISSENTING OPINION OF SENIOR JUDGE JONES

*Georgia Laws*

Ga.Code Ann. § 26–1101 (1972) provides:

"**Murder.**

"(a) A person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable

---

**25.** Any review for sentence appropriateness intrinsically calls for comparison of sentences imposed in similar cases. The Supreme Court has approved a statutory requirement for case comparison by the reviewing court, *see Gregg v. Georgia*, 428 U.S. at 223, 96 S.Ct. at 2948, but has not required it, *see Proffitt v. Florida*, 428 U.S. 242, 259, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976). However, the requirement that, consistent with the Eighth Amendment, a capital sentencing procedure must "promote the evenhanded, rational and consistent imposition of death sentences", *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976), requires such a comparison by any reviewing court.

**26.** At least one court has required that in order to satisfy the Eighth Amendment, the trial judge must 'clearly and explicitly instruct the jury about mitigating circumstances and the option to recommend against death ....' In that court's view 'the judge [would] normally tell the jury what a mitigating circumstance is and what its function is in the jury's sentencing deliberations.' *See Spivey v. Zant*, 661 F.2d 464 (5th Cir. 1981).

**27.** I disagree with Judge Foreman's conclusion that because confinement was not expressly stated in the sentence adjudged, the forfeitures cannot be applied at the time of the convening authority's action. I believe confinement for life is an inherent part of every sentence to death.

provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

"(b) A person also commits the crime of murder when in the commission of a felony he causes the death of another human being, irrespective of malice.

"(c) A person convicted of murder shall be punished by death or by imprisonment for life."

Ga.Code Ann. § 27–2503 (Supp.1975) provides:

**Presentence hearings in felony cases**

(a) Except in cases in which the death penalty may be imposed, upon the return of a verdict of "guilty" by the jury in any felony case, the judge shall dismiss the jury and shall conduct a presentence hearing at which the only issue shall be the determination of punishment to be imposed. In such hearing the judge shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant, or the absence of any prior conviction and pleas: Provided, however, that only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible. The judge shall also hear argument by the defendant or his counsel and the prosecuting attorney, as provided by law, regarding the punishment to be imposed. The prosecuting attorney shall open and the defendant shall conclude the argument. In cases in which the death penalty may be imposed, the judge when sitting without a jury shall follow the additional procedure provided in section 27–2534.1. Upon the conclusion of the evidence and arguments the judge shall impose the sentence or shall recess the trial for the purpose of taking the sentence to be imposed under advisement. The judge shall fix a sentence within the limits prescribed by law. If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment.

(b) In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted in the same manner as presentence hearings conducted before the judge as provided in subsection (a) of this section. Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in section 27–2534.1, exist and whether to recommend mercy for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law.

Ga.Code Ann. § 27–2534.1 (Supp.1975) provides:

**Mitigating and aggravating circumstances; death penalty**

(a) The death penalty may be imposed for the offenses of aircraft hijacking or treason, in any case.

(b) In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence:

(1) The offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions.

(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, or the offense of murder was committed while the offend-

er was engaged in the commission of burglary or arson in the first degree.

(3) The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor or former district attorney or solicitor during or because of the exercise of his official duty.

(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

(8) The offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another.

(c) The statutory instructions as determined by the trial judge to be warranted by the evidence shall be given in charge and in writing to the jury for its deliberation. The jury, if its verdict be a recommendation of death, shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In non-jury cases the judge shall make such designation. Except in cases of treason or aircraft hijacking, unless at least one of the statutory aggravating circumstances enumerated in section 27–2534.1(b) is so found, the death penalty shall not be imposed.

Ga.Code Ann. § 27–2537 (Supp.1975) provides:

**Review of death sentences**

(a) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Georgia. The clerk of the trial court, within 10 days after receiving the transcript, shall transmit the entire record and transcript to the Supreme Court of Georgia together with a notice prepared by the clerk and a report prepared by the trial judge. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a narrative statement of the judgment, the offense, and the punishment prescribed. The report shall be in the form of a standard questionnaire prepared and supplied by the Supreme Court of Georgia.

(b) The Supreme Court of Georgia shall consider the punishment as well as any errors enumerated by way of appeal.

(c) With regard to the sentence, the court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether, in cases other than treason or aircraft hijacking, the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 27–2534.1(b), and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(d) Both the defendant and the State shall have the right to submit briefs within the time provided by the court, and to present oral argument to the court.

(e) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

(1) Affirm the sentence of death; or

(2) Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel. The records of those similar cases referred to by the Supreme Court of Georgia in its decision, and the extracts prepared as hereinafter provided for, shall be provided to the resentencing judge for his consideration.

(f) There shall be an Assistant to the Supreme Court, who shall be an attorney appointed by the Chief Justice of Georgia and who shall serve at the pleasure of the court. The court shall accumulate the records of all capital felony cases in which sentence was imposed after January 1, 1970, or such earlier date as the court may deem appropriate. The Assistant shall provide the court with whatever extracted information it desires with respect thereto, including but not limited to a synopsis or brief of the facts in the record concerning the crime and the defendant.

(g) The court shall be authorized to employ an appropriate staff and such methods to compile such data as are deemed by the Chief Justice to be appropriate and relevant to the statutory questions concerning the validity of the sentence.

(h) The office of the Assistant shall be attached to the office of the Clerk of the Supreme Court of Georgia for administrative purposes.

(i) The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration. The court shall render its decision on legal errors enumerated, the factual substantiation of the verdict, and the validity of the sentence.

*Florida Laws*

Fla.Stat.Ann. § 782.04 (Supp.1976–1977) provides:

**Murder**

(1)(a) The unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any arson, involuntary sexual battery, robbery, burglary, kidnapping, aircraft piracy, or unlawful throwing, placing, or discharging of a destructive device or bomb, or which resulted from the unlawful distribution of heroin by a person 18 years of age or older when such drug is proven to be the proximate cause of the death of the user, shall be murder in the first degree and shall constitute a capital felony, punishable as provided in § 775.082.

(b) In all cases under this section, the procedure set forth in § 921.141 shall be followed in order to determine sentence of death or life imprisonment.

(2) The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be murder in the second degree and shall constitute a felony of the first degree, punishable by imprisonment for a term of years not exceeding life or as provided in § 775.082, § 775.083, or § 775.084.

(3) When a person is killed in the perpetration of, or in the attempt to perpetrate, any arson, involuntary sexual battery, robbery, burglary, kidnapping, aircraft piracy, or unlawful throwing, placing, or discharging of a destructive device or bomb by a person other than the person engaged in the perpetration of or in the attempt to perpetrate such felony, the person perpetrating or attempting to perpetrate such felony shall be guilty of murder in the second degree, which constitutes a felony of the first degree,

punishable by imprisonment for a term of years not exceeding life or as provided in § 775.082, § 775.083, or § 775.084.

(4) The unlawful killing of a human being, when perpetrated without any design to effect death, by a person engaged in the perpetration of, or in the attempt to perpetrate, any felony other than any arson, involuntary sexual battery, robbery, burglary, kidnapping, aircraft piracy, or unlawful throwing, placing, or discharging of a destructive device or bomb, shall be murder in the third degree and shall constitute a felony of the second degree, punishable as provided in § 775.-082, § 775.083, or § 775.084.

Fla.Stat.Ann. § 775.082 (Supp.1976–1977) provides in part:

**Penalties**

(1) A person who has been convicted of a capital felony shall be punished by life imprisonment and shall be required to serve no less than 25 years before becoming eligible for parole unless the proceeding held to determine sentence according to the procedure set forth in § 921.141 results in findings by the court that such person shall be punished by death, and in the latter event such person shall be punished by death.

Fla.Stat.Ann. § 921.141 (Supp. 1976–1977) provided:

**Recommendation to mercy; procedure when person convicted of capital felony**

(1) **Recommendation to mercy.**—A defendant found guilty by a jury of an offense punishable by death shall be sentenced to death unless the verdict includes a recommendation to mercy by the jury. When the verdict includes a recommendation to mercy by the jury, the court shall sentence the defendant to life imprisonment. A defendant found guilty by the court of an offense punishable by death when a jury is waived shall be sentenced by the court to death or life imprisonment.

(2) **Separate proceedings on issue of penalty.**—

(a) The guilt or innocence of every person charged with an offense for which the death penalty may be imposed upon conviction shall be determined first without a finding as to penalty. If such person has been found guilty of an offense for which the death penalty may be imposed, there shall be further proceedings on the issue of the penalty, and the trier of fact shall fix the penalty. The determination of whether the defendant will be recommended to the mercy of the court shall be in the discretion of the court or jury trying the issue of the facts on the evidence presented, and the penalty shall be expressly stated in the decision or verdict. If the defendant was convicted by the court sitting without a jury, the trier of fact shall be the court. If the defendant was convicted upon a plea of not guilty, the trier of fact shall be a jury, unless a jury is waived by the defendant and the state. If the defendant was convicted by a jury, the trier of fact shall be the same jury.

(b) There may be presented in the proceedings on the issue of penalty evidence of the circumstances surrounding the crime and of the defendant's background and history and any facts in aggravation or mitigation; including, but not limited to, those circumstances enumerated in subsections (3) and (4). The proceeding as to penalty shall be separate and distinct from proceedings regarding guilt or innocence, and the penalty proceeding shall be guided by the same rules of criminal procedure as are applied to the guilt or innocence phase of the trial.

(c) Where the jury is the trier of fact a recommendation to mercy shall require the affirmative vote of a majority of the jury. In any case in which the defendant has been found guilty by jury and the jury is unable to reach a verdict on the issue of penalty because of the inability of one or more of the jurors to function, the court shall dismiss the jury and order a new jury impaneled to determine the issue of penalty.

(3) **Aggravating circumstances.**—

(a) The capital felony was committed by a convict under sentence of imprisonment.

(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

(c) At the time the capital felony was committed the defendant also committed another capital felony.

(d) The defendant knowingly created a great risk of death to many persons.

(e) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary or kidnapping.

(f) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

(g) The capital felony was committed for pecuniary gain.

(h) The capital felony was especially heinous, atrocious, or cruel, manifesting exceptional depravity.

**(4) Mitigating circumstances.—**

(a) The defendant has no significant history of prior criminal activity.

(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(c) The victim was a participant in the defendant's conduct or consented to the act.

(d) The capital felony was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct.

(e) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.

(f) The defendant acted under duress or under the domination of another person.

(g) At the time of the capital felony the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or intoxication.

(h) The youth of the defendant at the time of the crime.

Fla.Stat.Ann. § 921.141 has been twice amended since *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). *See* Fla.Stat.Ann. § 921.141 (Supp.1981).

*Texas Laws*

Tex.Penal Code § 19.02 (1974) provides:

**Murder**

(a) A person commits an offense if he:

(1) intentionally or knowingly causes the death of an individual;

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3) commits or attempts to commit a felony, other than voluntary or involuntary manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

(b) An offense under this section is a felony of the first degree.

Texas Penal Code § 19.03 (1974) provides:

**Capital Murder**

(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

(1) the person murders a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman;

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson;

(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration;

(4) the person commits the murder while escaping or attempting to escape from a penal institution; or

(5) the person, while incarcerated in a penal institution, murders another who is employed in the operation of the penal institution.

(b) An offense under this section is a capital felony.

(c) If the jury does not find beyond a reasonable doubt that the defendant is guilty of an offense under this section, he may be convicted of murder or of any other lesser included offense.

Former Tex.Penal Code Art. 1256 (1973) provided:

### "Murder"

Whoever shall voluntarily kill any person within this State shall be guilty of murder. Murder shall be distinguished from every other species of homicide by the absence of circumstances which reduce the offense to negligent homicide or which excuse or justify the killing.

Former Tex.Penal Code Art. 1257 (1973) provided:

### Punishment for murder

(a) Except as provided in subsection (b) of this Article, the punishment for murder shall be confinement in the penitentiary for life or for any term of years not less than two.

(b) The punishment for murder with malice aforethought shall be death or imprisonment for life if:

(1) the person murdered a peace officer or fireman who was acting in the lawful discharge of an official duty and who the defendant knew was a peace officer or fireman;

(2) the person intentionally committed the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, forcible rape, or arson;

(3) the person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration;

(4) the person committed the murder while escaping or attempting to escape from a penal institution;

(5) the person, while incarcerated in a penal institution, murdered another who was employed in the operation of the penal institution.

(c) If the jury does not find beyond a reasonable doubt that the murder was committed under one of the circumstances or conditions enumerated in Subsection (b) of this Article, the defendant may be convicted of murder, with or without malice, under Subsection (a) of this Article or of any other lesser included offense.

(d) If one of the circumstances or conditions enumerated in Subsection (b) of this Article is charged in an indictment, the prospective jurors shall be informed that a sentence of either death or imprisonment for life is mandatory on conviction for the offense charged. No person is qualified to serve as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact.

(e) In this Article:

(1) "Penal institution" means an institution operated by or under the supervision of the Texas Department of Corrections or a city, county, or regional jail.

(2) "Peace officer" means a person defined as such by Article 2.12, Code of Criminal Procedure, 1965, as amended.

Tex.Code Crim.Proc. Art 37.071 (Supp. 1975–1976) provides:

### Procedure in capital case

(a) Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court before the trial jury as soon as practicable. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence. This subsection shall not be construed to authorize the introduction of any evidence secured in viola-

tion of the Constitution of the United States or of the State of Texas. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

(c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted.

(d) The court shall charge the jury that:

(1) it may not answer any issue "yes" unless it agrees unanimously; and

(2) it may not answer any issue "no" unless 10 or more jurors agree.

(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life.

(f) The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals within 60 days after certification by the sentencing court of the entire record unless time is extended an additional period not to exceed 30 days by the Court of Criminal Appeals for good cause shown. Such review by the Court of Criminal Appeals shall have priority over all other cases, and shall be heard in accordance with rules promulgated by the Court of Criminal Appeals.

O'DONNELL, Judge, concurring in part and dissenting in part:

I agree with parts I–XI and XIV of Judge Foreman's opinion. I dissent with respect to the constitutionality of the death penalty as it relates to premeditated murder under Article 118(1) of the Uniform Code of Military Justice. I agree with Senior Judge Jones that the procedures followed in this case do not survive constitutional scrutiny because the standards for the sentencing authority did not provide for "an informed, focused, guided, and objective inquiry into the question of whether [the appellant] should be sentenced to death." *Proffitt v. Florida*, 428 U.S. 242, 259, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976) (plurality opinion of Justices Stewart, Powell and Stevens).

I would only add that in my view the standards must come in large part, if not completely, from the legislature. In the military system, Congress defines crimes which may be tried by court-martial. With respect to sentence, Congress has provided in Article 56 of the Code that the President shall prescribe the maximum punishment for non-capital offenses. Congress has reserved to itself the responsibility for determining what offenses may carry a death sentence. Consistent with this expression of legislative policy, I believe that Congress should likewise be the authority to specify the standards mandated by *Furman et al.*[1]

The only statutory standard in the instant case is that of premeditation. I agree with Senior Judge Jones that this is insufficient. In Article 118(1), Congress has provided that a person convicted of premeditated murder may be sentenced to death or life imprisonment. Although the "standard" of premeditation distinguishes first-degree (Article 118(1)) from second-degree (Article 118(2)) murder, it does not provide a meaningful standard for distinguishing between a first-degree murderer who

1. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

should be put to death and one who instead should be sentenced to life imprisonment. Congress should establish with greater specificity what kinds of premeditated murder might warrant imposition of the death sentence, such as the state legislatures did in Florida, Georgia, and Texas. This should include as a minimum specific aggravating factors which will minimize the risk of uncontrolled discretion on the part of the sentencing authority and provision for consideration of other aggravating and mitigating factors which would be relevant to the particular accused and to the particular crime. Consideration of all of these factors should focus not only on why death should be imposed but why it should not be imposed in the individual case.[2] Because of the absence of adequate standards, I join with Senior Judge Jones in his dissent.

GARN, Judge, concurring in part and dissenting in part:

I agree with Judge Foreman's disposition of the issues addressed in Parts II through XI of his opinion. However, I do not agree with his conclusions regarding the lawfulness of the death penalty and the application of the adjudged forfeitures.

I agree with Senior Judge Jones' conclusion that the appellant's sentence to death may not be affirmed. Judge Foreman's opinion implicitly, and I think correctly, concedes that the intent to kill is not a sufficiently narrow relevant aggravating factor to permit imposition of the death penalty for murder. In my view, neither is premeditation a sufficiently narrow relevant aggravating factor so as to permit imposition of that penalty. As a practical matter, the distinction between an intentional unlawful killing and a premeditated unlawful killing is too tenuous, and too difficult to understand.

Furthermore, the members of the court-martial were not required to focus on the relationship between the premeditated nature of the killing and their decision regarding the death penalty. If premeditation is a sufficiently narrow factor so as to justify adjudging the penalty of death, the trial judge's instruction (or guidance) should have at least so informed the members, and required them to carefully weigh the nature and degree of the appellant's premeditation in their deliberations.*

Finally, aside from the constitutional issues, and considering the drastic nature of the death penalty, I agree with Senior Judge Jones' view that under current military law, the trial judge's sentencing instructions did not sufficiently guide the members concerning the extenuating and mitigating evidence they should have considered in their deliberations on whether the death penalty should be imposed. *See United States v. Wheeler,* 17 U.S.C.M.A. 274, 38 C.M.R. 72 (1967).

I also agree with Senior Judge Jones that confinement for life is an inherent part of a

---

2. The Manual for Courts-Martial, United States, 1969 (Revised edition), of course, sets forth at paragraph 75 certain factors that the sentencing authority should consider in determining an appropriate sentence in capital as well as non-capital cases. These "standards" are insufficient either by themselves or in tandem with the "standard" of premeditation as they do not provide for the "informed, focused, guided and objective inquiry" contemplated by *Furman et al.*

* In addition to the evidence of the appellant's having consumed alcoholic beverages, his low intelligence, and his abnormal mental processes and condition (which Dr. Reed characterized as a mental disease, at least for psychiatric diagnostic purposes), there is other evidence that the appellant's premeditated design to kill was not carefully calculated. He did not immediately attempt to hide or destroy the physical evidence clearly connecting him with the crime. When he did finally attempt to do so, his attempts were haphazard. He told several people about his crime, and his description of what he had done was rambling and sometimes incoherent. His repeated statements that "I *think* I killed the [victim]", (emphasis added) and his statement "I *think* she's dead" (emphasis added) after he had returned to the library and seen Mrs. Villanueva's dead body, also indicate that his killing was not a carefully conceived plan. Had the members been required to concentrate on the nature and degree of the appellant's premeditation, it is more likely that they would have recalled and weighed the evidence indicating the lack of a cold, carefully considered, premeditated design to kill.

sentence to death. In my opinion the adjudged forfeitures will apply from the date of the convening authority's action unless, at the conclusion of all the reviews of his case, his sentence does not include either death or confinement.

I would affirm a sentence including a dishonorable discharge, confinement at hard labor for life, forfeiture of all pay and allowances, and reduction to the grade of Private E–1.